[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 18-11602

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

LARRY B. HOWARD,
RAYMOND L. STONE,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Middle District of Florida

D.C. Docket No. 6:17-cr-00143-PGB-DCI-1

_____

2                    Opinion of the Court                    18-11602

_____

No. 18-12395

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee- Cross Appellant,

*versus*

NICOLE R. BRAMWELL,

Defendant-Appellant-Cross Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

D.C. Docket No. 6:17-cr-00143-PGB-DCI-2

_____

Before BRANCH, LUCK, and ED CARNES, Circuit Judges.

ED CARNES, Circuit Judge:

Like bears to honey, white collar criminals are drawn to bil-lion-dollar government programs.  An example is Tricare, which

provides health care insurance benefits for active and retired members of the military and their families. At last count, the Tricare program had around nine million beneficiaries and paid out to health care providers about fifty billion dollars a year.[1] Most of those providers have been honest.

Some have not been. *See, e.g., United States v. Chalker*, 966 F.3d 1177, 1182 (11th Cir. 2020) (pharmacist convicted of conspiring to submit "false and fraudulent claims" to Tricare); *United States v. Grow*, 977 F.3d 1310, 1313 (11th Cir. 2020) (marketer convicted of "conspiring to commit healthcare and wire fraud, committing healthcare fraud, conspiring to receive and pay kickbacks, receiving kickbacks, and money laundering," all of which were related to Tricare payments for compounded prescriptions); *United States v. Ruan*, 966 F.3d 1101, 1120 (11th Cir. 2020) (medical doctors convicted of numerous crimes, including conspiracies to commit health care fraud and mail or wire fraud and to receive kickbacks related to the Tricare program and other medical benefit programs), *cert. granted*, 142 S. Ct. 457 (2021); *United States v. Shah*, 981 F.3d 920, 922 (11th Cir. 2020) (medical doctor convicted of participating in a "kickback conspiracy that involved writing prescriptions for compounded drugs" paid for by the Tricare program).

---

[1] Def. Health Agency, *Evaluation of the TRICARE Program: Fiscal Year 2021 Report to Congress* 31 (2021).

In addition to the defendants in those cited cases, others who have violated federal law to enrich themselves off the Tricare program include the three appellants in this case. Nicole Bramwell[2] was a physician, Larry Howard was a pharmacist, and Raymond Stone is a veteran who retired from the Navy before the events in this case. The three were convicted of crimes involving the millions of dollars that Tricare paid Howard for filling compounded cream prescriptions for patients. Bramwell wrote the vast majority of those prescriptions, and Stone helped in recruiting some of the patients for whom Howard filled prescriptions. Federal law forbids paying or receiving kickbacks, or conspiring to do so, in connection with federal health care programs. The three of them were convicted for paying or receiving kickbacks and conspiring to do it. Howard was also convicted of laundering some of the proceeds.

---

[2] Bramwell was a physician at the time of the events in this case, but after she was convicted and sentenced, she surrendered her medical license. That fact is not included in the record, but we can take judicial notice of it as a publicly available state agency record. *See* Fla. Dep't of Health, https://mqa-internet.doh.state.fl.us/MQASearchServices/HealthcareProviders/LicenseVerification?LicInd=63666&Procde=1501&org=%20 (last visited Jan. 6, 2022); *K.T. v. Royal Caribbean Cruises, Ltd.*, 931 F.3d 1041, 1047–48 (11th Cir. 2019) (Carnes, C.J., concurring) (explaining that we may take judicial notice of publicly available agency records); Fed. R. Evid. 201(b), (d); *Terrebonne v. Blackburn*, 646 F.2d 997, 1000 n.4 (5th Cir. 1981) (en banc) ("Absent some reason for mistrust, courts have not hesitated to take judicial notice of agency records and reports.").

## I.  PROCEDURAL HISTORY

Bramwell, Howard, and Stone were tried on a seven-count indictment. Count One charged all three of them with a multi-object conspiracy to defraud the United States and to offer, pay, solicit, and receive health care kickbacks to submit claims to Tricare for prescription compounded drugs, in violation of 18 U.S.C. § 371. Counts Two and Three charged Bramwell and Stone with receiving health care kickbacks, in violation of 42 U.S.C. § 1320a-7b(b)(1)(A). Counts Four and Five charged Howard with paying those kickbacks to the two of them, in violation of 42 U.S.C. § 1320a-7b(b)(2)(A). Counts Six and Seven also charged Howard with money laundering related to the funds he derived from the kickback scheme, in violation of 18 U.S.C. § 1957.

After a five-day joint trial, the jury deliberated just over four hours before finding each defendant guilty of all the charges against that defendant. The district court held separate sentence hearings for each of them.  The court sentenced Howard to 160 months in prison; Stone to 24 months in prison; and Bramwell to no imprisonment at all, only 36 months of probation, with one year of it to be served in home detention.  (The home detention condition allowed Bramwell to "leave, for example, for work-related needs or medical treatment, that sort of thing.")

Every party appeals.  All three defendants challenge their convictions based on the sufficiency of the evidence.  Howard also contends that the government constructively amended his in-

dictment.[3]    And the government has cross-appealed, contending that Bramwell's sentence is unreasonably lenient.

## II.  THE SUFFICIENCY OF THE EVIDENCE

We review *de novo* the sufficiency of the evidence to support the jury verdict finding each defendant guilty of each crime with which that defendant was charged.  In conducting our review, we view the evidence in the light most favorable to the ver-

---

[3] Bramwell and Stone also contend that their convictions must be vacated because the underlying health care kickback statute is unconstitutional.  The argument deserves little attention, much less discussion.  *Cf. United States v. Iriele*, 977 F.3d 1155, 1165 n.6 (11th Cir. 2020).  They base the argument on a federal district court decision from Texas.  *See Texas v. United States*, 340 F. Supp. 3d 579 (N.D. Tex. 2018).  That decision does not bind us, its  reasoning does not apply to this case, and it has been vacated.  *See California v. Texas*, 141 S. Ct. 2104, 2120 (2021).

Additionally, Stone appealed his sentence, contending that the district court erred in refusing to apply a two-level minor role reduction when calculating his sentencing guidelines range.  During the course of this appeal, however, Stone finished serving the parts of his sentence that could be affected by a minor role reduction, including both his term of imprisonment and his term of supervised release.  Stone concedes that his completion of those parts of his sentence moots his appeal of it, the government agrees, and so do we.  *See, e.g.*, *North Carolina v. Rice*, 404 U.S. 244, 248 (1971); *United States v. Stevens*, 997 F.3d 1307, 1310 n.1 (11th Cir. 2021) ("A challenge to an imposed term of imprisonment is moot once that term has expired, but where a defendant is still serving other aspects of his sentence, e.g., paying a fine or serving a term of supervised release, any appeal related to that aspect of his sentence is not moot.") (citations omitted); *United States v. Farmer*, 923 F.2d 1557, 1568 (11th Cir. 1991).

dict and draw all reasonable inferences and make all credibility choices in favor of the verdict. *United States v. Iriele*, 977 F.3d 1155, 1168 (11th Cir. 2020). We must affirm if "after viewing the evidence in the light most favorable to the prosecution, *any* rational [finder] of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Hernandez*, 433 F.3d 1328, 1335 (11th Cir. 2005) (quotation marks omitted). "A guilty verdict cannot be overturned if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt." *Iriele*, 977 F.3d at 1168 (quotation marks omitted). And because a jury can freely choose among reasonable constructions of the evidence, "it is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *Id.* (quotation marks omitted).

In considering the sufficiency of the evidence supporting their convictions, we keep in mind what the substantive convictions were not based on and did not involve. This is not a traditional health care fraud case in which the prescriptions were alleged to have been medically unnecessary, although there is reason to believe many may have been. And it is not a medical or pharmaceutical malpractice case. The issues are not whether the prescriptions involved were legitimate or medically necessary or good or bad for the patient.

None of that matters to the sufficiency of the evidence because the substantive kickback convictions were based entirely on

whether there were kickbacks: In return for Bramwell writing prescriptions that Howard's pharmacy filled, did Howard pay and did Bramwell accept payments?  And in return for Stone recruiting potential patients for whom prescriptions could be written that Howard's pharmacy would fill, did Howard pay and did Stone accept payments?  The conspiracy convictions can be sustained based solely on evidence sufficient to support the kickbacks conspiracy without regard to any evidence of fraud.  *See United States v. Medina*, 485 F.3d 1291, 1301–02 (11th Cir. 2007) (evidence sufficient to prove any one of the charged objectives of a multi-object § 371 conspiracy is sufficient to sustain the conviction).  And Howard's challenge to his two money laundering convictions is based solely on his challenge to the sufficiency of the evidence to convict him of paying kickbacks.

### A. *Tricare, Compounded Creams, and the Investigation*

We begin with the evidence providing background information about Tricare and the type of medications that led to the kickback charges in this case.

Among the benefits that Tricare provides its members and beneficiaries is a program that pays participating retail pharmacies for prescriptions they fill for Tricare members. The program's coverage includes a number of compounded drugs.  Unlike a traditional prescription that is filled from a pre-made formulation already on the shelves, a prescription for a compounded drug requires a pharmacist to mix multiple ingredients together to meet a specific patient's special needs. The particular kinds of com-

pounded drugs involved in this case are creams prescribed as treatments for pain and scarring.

Until May 2015, Tricare reimbursed pharmacies in exorbitant amounts for compounded creams, paying them thousands of dollars for filling or refilling each prescription. The large payments generated a flood of prescriptions, which resulted in huge payouts to some pharmacies. The volume of claims and the glory days of payouts for participating pharmacies peaked in April 2015. That was when, to stem the flood of claims and the tidal wave of payouts, Tricare announced policy changes that would take effect the next month. The policy changes were designed to lower Tricare's payments for compounded cream prescriptions by substantially reducing the amount it would pay for some ingredients or categories of ingredients used in the creams. The new policy achieved its goal; it drastically reduced the total amount of money Tricare paid each month to pharmacies for filling compounded cream prescriptions. Tricare's monthly payouts plummeted 98 percent, from $480 million to $10 million.

At about the same time, the government started looking into why Tricare had experienced such a dramatic increase in claims for compounded creams and the payouts for them before the policy change. A team within the Defense Health Agency searched Tricare databases for pharmacies whose claims had deviated significantly from those of the typical pharmacy. The yellow flags that the team looked for were: the total dollar amount in compounded cream prescriptions; a sudden growth in claims

within a few months; filling prescriptions from only one or a few doctors instead of many; filling exclusively, or nearly exclusively, compounded drug prescriptions; and filling a large proportion of the prescriptions for patients who were not geographically close to the pharmacy. The team's search resulted in a list of pharmacies to be investigated. With every one of those yellow flags flying over Larry Howard's pharmacy, it easily made the list, and the investigation led to the indictment in this case.

## B. *The Elements of the Crimes*

Howard was convicted of two counts of paying health care kickbacks in violation of 42 U.S.C. § 1320a-7b(b)(2)(A). One of those counts was for paying kickbacks to Bramwell, and the other one was for paying kickbacks to Stone. For those two of Howard's convictions to stand, the government must have presented evidence from which a jury could reasonably find beyond a reasonable doubt that Howard: "(1) knowingly and willfully, (2) paid money, directly or indirectly, to [Bramwell and Stone], (3) to induce [them] to refer individuals to [Howard's pharmacy] for the furnishing of [compounded drugs], (4) paid for by [Tricare]." *United States v. Vernon*, 723 F.3d 1234, 1252 (11th Cir. 2013).

Bramwell and Stone were each convicted of one count of receiving those kickbacks from Howard, in violation of 42 U.S.C. § 1320a-7b(b)(1)(A). For the conviction of each of them to stand, the government must have presented evidence from which a jury could reasonably find beyond a reasonable doubt that the defendant: "(1) knowingly and willfully (2) solicited or received money

(3) for referring individuals to [Howard's pharmacy] (4) for the furnishing of services to be paid by [Tricare]." *United States v. Nerey*, 877 F.3d 956, 968 (11th Cir. 2017).

All three defendants were convicted of conspiring to pay or receive health care kickbacks, in violation of 18 U.S.C. § 371. For those convictions to stand, the government must have presented evidence from which a jury could reasonably find beyond a reasonable doubt that: (1) a conspiracy existed; (2) the defendant knew about it; and (3) the defendant, with knowledge, voluntarily joined it. *United States v. Sosa*, 777 F.3d 1279, 1290 (11th Cir. 2015). A defendant can be convicted of conspiracy even if he did not play a major role in the scheme, did not directly interact with the other co-conspirators, did not participate in every stage of the conspiracy, and did not know all of the details. *United States v. Reeves*, 742 F.3d 487, 497–98 (11th Cir. 2014).

Conspiracy convictions do require proof that the defendant knew the essential unlawful object of the conspiracy and agreed to it. *United States v. Dixon*, 901 F.3d 1322, 1335 (11th Cir. 2018). But that proof may be circumstantial, and we have "made clear that, because the crime of conspiracy is predominantly mental in composition, it is frequently necessary to resort to circumstantial evidence to prove its elements." *Sosa*, 777 F.3d at 1290 (alteration adopted and quotation marks omitted). It bears noting again that although the indictment in this case alleged multiple objects of the conspiracy, only one of those objects needed to be proven to support the conspiracy convictions, meaning it is enough if the

12                    Opinion of the Court                    18-11602

defendants conspired to pay or receive kickbacks, even if there was no fraud. *See Medina*, 485 F.3d at 1301.

For each of Howard's two 18 U.S.C. § 1957 money laundering convictions to stand, the government must have presented evidence from which a jury could reasonably find beyond a reasonable doubt that he "knowingly engage[d] in a monetary transaction in criminally derived property of a value greater than $10,000 that is derived from [the kickback scheme]." *United States v. Toll*, 804 F.3d 1344, 1358 (11th Cir. 2015) (cleaned up).

## C.  *The Evidence that the Jury Heard*

Howard was a pharmacist and operated Fertility Pharmacy in Winter Springs, Florida. He had owned it at least since 2010, when, as the name suggests, it was focused on fertility related drugs.  But starting in 2014 Fertility's focus changed to nonfertility services and prescriptions, and by early 2015 Fertility was entirely out of the fertility field.  From 2014 until June 2015, the vast majority of the prescriptions filled at Fertility Pharmacy were for compounded creams for patients covered by Tricare.  According to one person who worked there during that time, compounded creams were "almost 90 percent of" the prescriptions that Fertility filled.

Howard told an employee who worked at Fertility and who later testified at trial that the reason he changed his business plan from fertility drugs to compounded creams was because of "the pay." He could make more for filling them than he had ever made

filling prescriptions related to fertility. The compounded creams were extremely lucrative for Fertility Pharmacy. According to that employee, Howard told him that Tricare regularly paid Fertility between $14,000 and $18,000 each time it filled a compounded cream prescription, and according to one of Fertility's pharmacy technicians, Tricare would pay anywhere from $9,000 to $23,000 per prescription.[4]

It is unclear how much net profit Fertility made from filling prescriptions for the compounded creams because the record does not show what Fertility's costs were. But the record does show that the revenue Fertility received was substantial. During the period of only 14 months between April 2014 and May 2015, Tricare paid Fertility a total of $4,399,697 for filling compounded drug prescriptions, almost all of which were for compounded creams.

Before Howard could generate that much revenue, he had to have enough compounded cream prescriptions to fill. And the more the better for him. To increase the number of compounded cream prescriptions that came to Fertility, Howard took several

---

[4] Our review of the record suggests an average reimbursement amount of about $9,400 for filling or refilling a compounded cream prescription. That average is based on the number of those prescription claims that Fertility submitted to Tricare during a fourteen-month period (468), and the total amount Tricare paid Fertility for them ($4,399,697). The $9,400 per prescription was only an average. Tricare paid Fertility more than $19,000 for compounded cream prescriptions on some occasions.

steps.  One thing he did is create a company he named "Tricare Wellness," which had no actual affiliation with Tricare. To promote it, he mailed a flyer advertising the "Tricare Wellness Program" and claiming to offer several "free evaluations" for a variety of health or wellness issues: increasing testosterone and treating erectile dysfunction; weight loss, nutrition, and physical fitness; bioidentity hormone replacement; and treating pain, wounds, and scars.  The flyer did not identify Fertility Pharmacy anywhere on it, but instead directed people to call a phone number.

Calls to that number were routed to a center that Howard had set up, where the caller would speak to someone who would see if the caller could be written any compounded cream prescriptions.  The call center workers Howard employed would ask the caller, among other things, if he had scars, wanted to lose weight, and was active or retired military.  Questions about military service were important because active or retired members of the military would likely have Tricare insurance, presenting the potential for prescription payouts, each one for thousands of dollars.

As a pharmacist Howard couldn't write prescriptions, he could only fill them.  Information about Tricare eligible patients wouldn't do him any good unless he had a doctor who would write the prescriptions and see that they came to Fertility Pharmacy.  That's where Bramwell came in.

After a caller was identified by Howard's call center employees as a potential patient who was eligible for Tricare, the

employee entered the information on a worksheet, which was either faxed or hand delivered to Bramwell.  Always to her, never to any other doctor.  Howard was adamant about that.  One employee, who worked as a pharmacy technician but also sometimes helped with the call center, testified that it was something that was "grilled in us, in all of us, all the time" — that they "need[ed] to get those [worksheets] over to Dr. Bramwell."

Once Bramwell received a worksheet, she did not wait for the potential patient to call her.  She made the call, conducted a phone evaluation, and then either faxed or hand-delivered one or more compounded cream prescriptions for that patient to Fertility — without asking the patient for their pharmacy preference. A witness who had worked at Fertility Pharmacy testified about a time that Bramwell came into the pharmacy with a stack of at least 20 prescriptions and took them into Howard's office.  After she left the prescriptions with him, Howard was excited and "smiling from ear to ear and he was very, very jovial at the time." Howard proclaimed to those who were there that it was a "really, really good day that we had today" because he was "going to get paid."

Not only did Bramwell write the compounded cream prescriptions that generated most of Fertility Pharmacy's revenue, she also did her part to bring in more patients for whom the lucrative prescriptions could be written and sent to the pharmacy. One thing she did was appear in a video advertising Howard's

"Tricare Wellness Program," which had the purpose of recruiting compounded cream prescription patients.

Another thing that Bramwell did was run a free six-to-eight- week weight loss program under the auspices of Howard's "Tricare Wellness Program," even though Tricare doesn't pay for weight loss. The free weight loss program did provide some legitimate health benefits. Bramwell met with participants weekly and gave them a packet of pills, a shot in the arm, and instructions about how to count calories. But weight loss was not the only, or the primary, thing the program generated. It also generated more compounded cream prescriptions for Bramwell to write, which in turn generated more revenue for Fertility Pharmacy.

The weekly meeting of the weight loss program took place in the back offices of Fertility Pharmacy itself. Bramwell would weigh the participants, but that's not all she would do. She would also talk about pain management with some of the people and offer to prescribe compounded creams for them. When she prescribed the creams, she didn't ask participants which pharmacy they normally used or where they wanted their prescriptions to be filled. Without asking the patient, she sent the prescriptions straight to Fertility Pharmacy.

Bramwell also generated prescriptions for Fertility to fill in other ways. She saw people who were not in her weight loss program and persuaded them to let her write compounded cream prescriptions for them. One of those patients stands out as a par-

ticularly striking example of how far Bramwell went to gin up the number of those prescriptions and the resulting revenue for Fertility. Sometime in early 2015, that patient had received a flyer that had "a statement about pain management." Because he had chronic pain from injuries he had suffered during his 20 years of service in the Army, he called the number listed on the flyer. As far as the patient remembered, the person he spoke with asked only whether he had Tricare insurance, and "[s]omething about a water filtration system." He was given an appointment to see Bramwell in the middle of February 2015.

On the scheduled day, the patient arrived at the address he had been given, which was located in what he described as "a small strip mall-like" building that "didn't seem like a doctor's office," but instead seemed "like some cleaning [company] of some sort." As he walked into the office, he noticed that "it was odd for a clinic or a medical facility." Even the back of the office, where he met with Bramwell, "didn't look like a medical office" and didn't have "any . . . medical equipment of any sort." Though this patient could not recall the name of the place he went, his description of it matched other witnesses' descriptions of Fertility Pharmacy. And other witnesses testified that Bramwell met with patients at Howard's Fertility Pharmacy.

When this patient met with Bramwell, she asked him about the issues he had with pain and scarring, including how long he had experienced the pain and where it was. As far as he remembered, she didn't do a physical exam — it was "just verbal."

She also asked him questions about his wife and "her medical conditions and whatnot," and questions similar to the ones she had asked the patient about himself, including whether his wife had pain and whether she had any scars.

At the end of the appointment, the patient was not given anything: "no papers, no prescription, nothing whatsoever." He was told that he would soon receive "creams for [his] pain management and scarring." But he wasn't told those would be prescription creams and was never given a prescription for them. He didn't pay a copay for his visit with Bramwell, and he didn't pay a copay for the creams.

Even so, about two weeks later, the patient received by hand delivery a box containing eight or nine bottles of compounded creams that Bramwell had prescribed for him. The patient recalled the name of the pharmacy that filled the prescriptions for the creams as something about fertility.

He was surprised to see that some of the creams in the box had been prescribed for his wife. That surprised him because Bramwell had never seen or spoken to her, and no one had asked Bramwell to prescribe the compounded creams or anything else for her. Bramwell did so without authorization or permission. The man's wife also testified at trial, confirming her husband's testimony that she had never asked for the creams and had never seen or spoken to Bramwell about anything.

The man and his wife received several more shipments of the creams, anywhere from "seven to nine" more boxes, which was three months' worth for the two of them. They stopped receiving the compounded creams around the end of April 2015, which was right at the time Tricare's policy changed to curtail the exorbitant payouts to pharmacies for the creams. *See supra* at 10.

At no time did either Bramwell or anyone at Fertility Pharmacy ever follow up with this man or his wife. The whole process was, the man testified, "not the norm." For example, he explained, "[u]sually Tricare won't do nothing, won't do any medical care for a patient unless you have a referral from your primary care physician." But he had been told when he visited Bramwell: "Don't worry about the referral," and "don't worry about the [copays]. We will take care of all of that." The man was so disturbed by how strange his experience had been that he eventually complained about it to Tricare.

For filling three months' worth of the compounded cream prescriptions that Bramwell wrote for this man and delivered directly to Fertility Pharmacy, Tricare paid the pharmacy $73,757.91. And Tricare paid it $57,810.58 more for filling the prescriptions for compounded creams that Bramwell, unsolicited, had written for the man's wife, whom she had never even seen or talked with. In all, Tricare paid Fertility Pharmacy $131,568.49 for the three months' worth of compounded cream prescriptions for this one married couple.

The couple's story is only some of the evidence of how aggressive Bramwell was in generating compounded cream prescriptions for Fertility Pharmacy, and it alone, to fill. She was nothing if not prolific. In the 14 months between April 2014 and May 2015, Bramwell wrote 394 prescriptions for compounded medications, most or all of which were for creams, that were filled by Fertility. During that entire period, she wrote 81 percent of the total compounded drug prescriptions that Fertility filled and charged to Tricare. The prescriptions that she wrote in that 14-month period resulted in Tricare paying Fertility a total of $3,560,804. (Seven other doctors wrote the remaining 19 percent of compounded drug prescriptions that Fertility filled. The one of those seven other doctors who wrote the most compounded cream prescriptions accounted for only approximately $331,000 of Tricare payments to Fertility. At least some of those other doctors were unindicted co-conspirators.)

It is not as if Bramwell also wrote a lot of other types of prescriptions during that 14-month period, or even a moderate amount of them. During the entire time she was writing $3.5 million worth of compounded cream prescriptions for Fertility Pharmacy, she wrote only $16 worth of other types of prescriptions, which made Fertility virtually nothing by comparison. She devoted herself with obsessive exclusivity to the narrow type of prescriptions that were most lucrative for Fertility Pharmacy, almost never prescribing any other type of medication.

And Bramwell did not restrict her efforts to the State of Florida, where she was licensed to practice. Far from it. Sixty-one percent, or $2,184,635 of the total dollar amount, of compounded cream prescriptions she wrote were prescriptions filled for people who were not even residents of Florida, but lived in 16 other states. Some lived as far away as Arizona, Oklahoma, New Jersey, and New York. There was no evidence that she had physically examined or even seen any of those distant patients.

One might wonder why a physician would go to such lengths to bestow so much business and so much revenue and profit on one particular pharmacy. The answer, a jury could reasonably infer from the evidence, as the jury in this case did, is that Howard paid Bramwell to send all of those compounded cream prescriptions to him. In the 14-month period between October 27, 2014, and December 16, 2015, Howard paid Bramwell $138,500.

And the way he paid her is telling. He wrote her 34 different checks ranging in amount from $1,000 to $10,000. And he usually wrote Bramwell more than one check on the same day. For example, he wrote her two checks on January 27, two on February 11, two on February 27, and two more on November 4, 2015; he wrote her three checks on March 18, three on April 1, and three more on June 3, 2015; and he wrote her four checks on April 20, and four more on September 25, 2015. The memo lines on the checks included notes such as "Weight Loss Seminar," "Seminar & Training," "Weight Loss Class," "Seminar for Pa-

tients," "Seminar," "C.E. Seminar," and sometimes various initials: "B.M/MH"; "JT & HM"; "SM R.M." Those initials were never identified or explained, but the jury could reasonably have inferred that the initials "B.M./MH" corresponded to two people for whom Bramwell had written compounded cream prescriptions because two of them had those initials.

There was no evidence explaining why Howard would pay Bramwell for conducting a weight loss seminar or class. Nor was there any evidence of any legitimate reason why he paid her $138,500 in 34 different checks over 14 months, which largely corresponded with the time she was sending him millions of dollars' worth of prescriptions to fill.

The variation in the amounts that Howard paid Bramwell correlated with the variation in payments Fertility received from Tricare. Starting in October 2014, Fertility's payments from Tricare jumped from $21,227 the previous month to $93,919, more than four times as much. That October had been the first month that Howard paid Bramwell; he paid her $2,000 then. After that, it was off to races for both of them. Fertility's monthly Tricare reimbursements never dropped below $100,000 until June 2015, when they abruptly dropped to $0 after the program's policy changes.

In the period from October 2014 until June 2015, Fertility's monthly payments to Bramwell generally increased alongside Howard's increasing payments from Tricare. For example, in February 2015 Bramwell received $15,700, and by the peak month of

April 2015, when Fertility received $1,562,931 from Tricare, Howard paid Bramwell $32,800 — his largest payment to her coincided with his largest payment from Tricare. Howard did send Bramwell several more payments after June 2015, including $25,000 in July 2015 and a final $5,000 check in December 2015. (The evidence does not indicate what the time lag was between Bramwell writing a prescription and sending it to Fertility; the pharmacy filling it and filing a claim with Tricare; and the pharmacy being paid by Tricare for filling it.)

As the district court observed at sentencing: "[Y]ou can trace the spike in compensation by Tricare with the prescriptions being written by Dr. Bramwell and the payments to her by Mr. Howard. As the reimbursement [to the pharmacy] goes up, the payments go up to Dr. Bramwell. As reimbursement goes down, the payments go down." That's what kickbacks do.

We should not overlook Raymond Stone. The indictment, evidence at trial, and jury verdict didn't overlook him. His role in the scheme was to recruit Tricare eligible patients to receive compounded cream prescriptions. Those patients were in addition to the ones generated by Howard's and Bramwell's own efforts.

To do his part, Stone used email marketing and went to events that current and past members of the military were likely to attend, such as meetings for submarine veterans. In his emails to potential patients and at events, he would introduce himself as "Lieutenant Commander Ray Stone," a disabled submarine veteran. Although he was a disabled Navy veteran, Stone was neither a

24                    Opinion of the Court                    18-11602

submarine veteran nor had he ever been a Lieutenant Commander.  Far from it.  When he was discharged from the Navy, his rank was "disbursing clerk, seaman apprentice," an enlisted position with the second lowest pay grade in the Navy.

At the time of the kickback scheme, Stone was a vendor for a company that sold alkaline water machines.[5]  He used those machines as a hook to generate interest in the compounded creams.  At the meetings Stone attended, he told potential patients that their status as veterans, disabled veterans, or Tricare beneficiaries meant they could get the alkaline water machines for free.  Stone also marketed the machines by email, telling people that "retired military" could receive the water system as an "amazing gift," or "at NO COST – NO STRINGS and BE PAID TO USE IT!"  He told some people that the offer would "expire" on April 30, 2015, which, though he didn't say it, corresponded to the date that Tricare's compounded cream prescription payment policies were set to change to the detriment of pharmacies.

Stone's statements about the alkaline water machines being free were as accurate as his resume, which is to say not very.  The water systems were not free to anyone, veteran or not, retired or

_____

[5] The machines could be used to produce alkaline water, which is water with a pH above 7.  Drinking alkaline water is purportedly good for a person's health, although the record does not specify how, other than possibly for helping with weight loss; nor was the question of whether drinking it had any beneficial effect relevant to any issue at trial.

not, disabled or not. And Tricare did not pay any part of their cost. A single machine cost between $1,480 and $3,980, and each one was paid for either by Stone himself or by Howard. The source of the payment did not affect the commission Stone got from the company for each sale. Regardless of who paid for one of the machines, even if he did so personally, Stone still received a commission of about $1,000 to $1,400 a machine, depending on the model. The more machines he sold, the more money he was paid by the company that was marketing the machines through him.

Along with pushing the alkaline water machines, Stone pushed the Tricare members he recruited toward compounded cream prescriptions. He did that by referring them to doctors, including Bramwell. The doctors would evaluate the veterans for pain and scars, among other things, prescribe compounded creams, and send the prescriptions to Fertility, which would be paid by Tricare for filling them.

Although none of the patients Stone recruited testified that they believed they had to get compounded creams in order to be given a "free" water machine, at least one of them testified that Stone told him he needed to go to a doctor to get a prescription for the machine. That was not true. And instead of that patient going to his usual doctor, Stone set up a doctor's appointment for him and told the man that he "might even get some ointments for joint pain." That patient never actually obtained a water machine, but he did get prescriptions for compounded creams. The pa-

tient's prescriptions were filled by Fertility Pharmacy after the doctor who prescribed them "turned it in" to Fertility. Tricare paid the pharmacy $27,585.43 for filling that patient's prescriptions.

Stone was a skilled recruiter. As a way of making sure that Howard knew which patients he had recruited, Stone would fax Fertility lists of the patients he had recruited, lists that often ended up including "at least four new patients a week." (Despite the testimony at trial that Stone recruited four patients a week, at sentencing he was held accountable for only 16 patients.) He was so good at recruiting patients that, as one Fertility employee testified, Howard "was constantly upset because [his other employees] couldn't bring in patients, and Ray Stone was bringing in all these patients." Once Howard directed two of his employees to go with Stone to a Veterans Administration hospital or medical center so Stone could "show [them] how he was bringing in patients." They met Stone there, and he immediately began instructing them how to recruit patients.

Howard kicked back to Stone in two ways. He did so directly through checks and also indirectly by paying for alkaline water machines that Stone "sold" to other people, which earned Stone commissions from the company that was marketing them.

Howard told one of his pharmacy employees why he was paying Stone: he said that Stone "was getting paid for each patient that he'd bring in." Howard paid Stone a total of $20,528.40 in direct payments during the three-month period between April 14,

2015, and June 8, 2015. The payments to Stone came in the form of six checks from companies that Howard owned or operated, and they ranged in amount from $557.70 to $5,115.40. The checks had the following memo lines: "Finder Fee, RT"; "Finder Fee, SF"; "Finder Fee RH"; "Donation"; "Donation"; and "Equipment Sales." Stone also received commissions on at least six water systems that Howard personally paid for.

As with Howard's payments to Bramwell, there was no evidence offered that the money he paid to Stone was for anything other than generating patients to receive prescriptions that were filled at Fertility and billed to Tricare. After Tricare's policy change in May 2015, Stone stopped sending lists of patients to Fertility and Howard quit paying Stone.

D. *The Evidence Was Sufficient to Prove All of the Charges*

1. Howard Paid, and Bramwell Received, Kickbacks and They Conspired to Do So

Bramwell contends that the evidence was insufficient to convict her of receiving and conspiring to receive kickbacks from Howard. And Howard contends the evidence was insufficient to convict him of paying and conspiring to pay kickbacks to her. They are both wrong.

Bramwell argues in her brief that the "government's theory of prosecution fails to consider numerous legal reasons why there might be a flow of traffic coming from Dr. Bramwell's office to Fertility Pharmacy including the fact some of their salesmen

people like Mr. Stone could be referring potential patients to Dr. Bramwell." Initial Brief of Appellant Bramwell at 4–5. She uses the word "including," but her Stone-caused-me-to-do-it theory is the only one she offers to explain why she wrote so many compounded cream prescriptions that were being filled by Fertility Pharmacy.

Her theory is plainly unconvincing for two reasons. First, even if there were a plausible innocent explanation for her extreme efforts to ensure that Fertility Pharmacy got the largest number of compounded cream prescriptions that she could write, the law is settled that the prosecution does not have to rule out every innocent explanation for the conduct that supports a finding of guilt. *See Iriele*, 977 F.3d at 1168 (noting that because a jury can freely choose among reasonable constructions of the evidence, "it is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt"); *accord Grow*, 977 F.3d at 1320; *United States v. Cabezas-Montano*, 949 F.3d 567, 595 n.27 (11th Cir. 2020). The reason that the evidence need not exclude every hypothesis of innocence or be inconsistent with every conclusion but guilt is that "the issue is not whether a jury reasonably could have acquitted but whether it reasonably could have found guilt beyond a reasonable doubt." *United States v. Campo*, 840 F.3d 1249, 1258 (11th Cir. 2016) (quotation marks omitted).

Second, even if a reasonable hypothesis of innocence were enough to bar conviction, Bramwell's attempt to blame Stone is

not a reasonable hypothesis of innocence anyway.  Her theory assumes that no more than one person could be receiving kickbacks from Howard at any given time, which is not a valid assumption.  And even if Stone brought her every one of all of those patients for whom she wrote 394 prescriptions that gained her kickbacks, she is still guilty.  That Stone, too, received kickbacks does not exonerate her.

Not only that, but there is no evidentiary basis for her theory that Stone was the cause of it all.  The evidence overwhelmingly proved that Bramwell played a far more significant role in the scheme than Stone did.  She, and not Stone, wrote the compounded cream prescriptions that were critical to the operation of the scheme.  She, and not Stone, made sure that her prescriptions went to Fertility Pharmacy and nowhere else.  She, and not Stone, sent the pharmacy enough of the prescriptions during a 14-month period that Tricare paid it more than $3.5 million dollars.  The entire scheme was centered on compounded cream prescriptions and Bramwell, not Stone, was the one who wrote them and saw that they went to Fertility Pharmacy.  That is why she received nearly seven times more in kickbacks than Stone.

Bramwell's unconvincing attempt to blame Stone for all of the compounded cream prescriptions that she wrote for Fertility Pharmacy to fill does nothing to explain why Howard paid her $138,500 in 34 different checks that largely corresponded with the period in which she was the lynchpin in the scheme that was making him wealthy.  Nor does it explain why some of those checks

came in multiples on the same day. Nor does it explain why some of her checks from Howard had implausible or unexplained notations on their memo lines designed to hide what the payments were for. As the district court put it, "Those checks were disguised." False notations were put on them "to make it appear that it was for some other service." No wonder the jury found beyond a reasonable doubt that Bramwell conspired to and did receive kickbacks from Howard for sending Tricare-covered compounded cream prescriptions to Fertility Pharmacy. And no wonder the district court volunteered at sentencing that it agreed with the jury's verdict.

Of course, the same evidence that proves Bramwell received kickbacks from Howard for writing compounded cream prescriptions that his pharmacy filled also proves that Howard paid her those kickbacks for doing it. Howard argues, as he tried to convince the jury, that those 34 checks to Bramwell totaling $138,500 were not to pay her for sending him $3.5 million dollars' worth of Tricare prescription business; that was merely a coincidence. The real reason he paid Bramwell all of that money in all of those checks was, or conceivably could have been, to reward her for assisting veterans. Maybe he was just being indirectly charitable toward veterans, through her, because he was deeply appreciative of their service to the country. The jury did not buy that theory, nor did the district court, nor do we.

As we have already pointed out, the government is not required to disprove every reasonable hypothesis of innocence —

the jury can choose between different theories. And the government certainly is not required to disprove an unreasonable hypothesis of innocence with no evidence to support it. There is no evidence that Bramwell was assisting veterans, except indirectly as part of a scheme to enrich Howard and herself at the expense of Tricare.

Remember what she was doing during the 14-month period when Fertility Pharmacy was raking in $3,560,804 from Tricare for filling her compounded cream prescriptions, and Howard was sending her checks. She was writing that type of prescription to the virtual exclusion of every other kind. In the same 14-month period between April 2014 and May 2015, Bramwell wrote 394 prescriptions for compounded medications, most or all of which were for creams, that she made sure were filled by Fertility. She wrote 81 percent of the total compounded drug prescriptions that Tricare paid Fertility $3,560,804 to fill. During that same period she wrote a grand total of only $16 worth of the far less expensive other types of prescriptions for which Tricare paid Fertility only a pittance by comparison. (And we do mean pittance by comparison: $3,560,804 is 222,550 times more than $16.)

As we have mentioned, when it came to writing prescriptions Bramwell devoted herself almost exclusively to the type that was most lucrative for Fertility Pharmacy. *See supra* at 16, 21–22. It would not be reasonable to assume that virtually all of a doctor's patients who were prescribed medication required only a relatively rare type of prescription medication that just happened to

be extremely lucrative for a pharmacy whose owner just happened to be paying the doctor a substantial amount of money during the same period of time.

It would be especially unreasonable to make such an unsupported assumption in light of the abrupt change in Bramwell's actions in June of 2015. That is the first month after the Tricare policy changes drastically cut the payments that Fertility Pharmacy and others were receiving for filling compounded cream prescriptions. The compounded cream medications themselves did not change, nor is there any suggestion that the medical needs of Bramwell's patients changed. Yet her prescribing actions changed drastically when the monetary interest of Howard's pharmacy did. The Tricare policy change caused Fertility Pharmacy's payments for filling compounded cream prescriptions to go from $930,352 in May 2015 to $0 in June 2015.

As Fertility's compounded cream revenue plummeted, so did Bramwell's interest in the medications. She suddenly went from being a compounded cream prescription writing machine to being a doctor who seemed unaware of the existence of that type of medication. During the four months before the Tricare policy change, she had written more than $500,000 worth of compounded cream prescriptions monthly, all to be filled at Fertility Pharmacy, and then she turned on a dime to writing none at all. When that type of prescription would no longer bring in millions of dollars of revenue for Howard and result in him favoring her

with a steady stream of kickback payments, she lost all interest in writing them.

And she also apparently lost interest in the well-being of the patients for whom she had already written compounded cream prescriptions. There is no evidence that she continued to prescribe those special medications or followed up with any of her patients to see if they needed a new prescription for them. Nor is there any reason to believe that the pain and scars of all of the patients for whom she had prescribed the compounded creams disappeared, and that new patients with those problems quit appearing, all at the same time that opportunities to make big money from compounded cream prescriptions vanished.

As the district court noted, "on the issue of medical necessity, patients stopped needing the creams, contemporaneous with the change in reimbursements by Tricare, which indicates, at least one indication, that it was not medically necessary." Bramwell wrote the compounded cream prescriptions because Howard was making a lot of money off of them and kicking some of it back to her, and she stopped writing the prescriptions when that was no longer possible. Patient welfare was not enough to motivate her to write them; $138,500 under the table was.

The timing of Howard's 34 payments to Bramwell also supported a reasonable inference of both defendants' guilt because the frequency and amounts of Howard's checks to Bramwell roughly correlated with Fertility's Tricare reimbursements. The first month that Howard paid Bramwell was the month when

Fertility's reimbursements from Tricare more than quadrupled from $21,227 to $93,919. And in April 2015, when Fertility received $1,562,931 in reimbursements from Tricare — nearly three times the amount it had received from Tricare in any previous month — Howard paid Bramwell $32,800, which was nearly twice the amount he had paid her in any previous month.

The evidence was sufficient to show that Howard paid, and Bramwell received, kickbacks for prescriptions she wrote and his pharmacy filled, and that they conspired to do so, as charged in the indictment.

### 2. Howard Paid, and Stone Received, Kickbacks and They Conspired to Do So

Stone argues that the money Howard gave him "involved bona fide, good-faith, arm's length dealings that were far outside the arena of and had nothing to do with Dr. Bramwell's prescriptions." He also argues that the evidence did not show that "he had knowledge of and participated in a conspiracy by improperly recruiting patients to defraud Tricare."

Stone's arguments are conclusory and contrary to the evidence. The evidence was essentially undisputed that Stone's recruiting efforts led to Howard's pharmacy being paid a substantial amount of money by Tricare for filling compounded cream prescriptions that it would not have had an opportunity to fill but for Stone. As a result of Stone's recruiting skills and efforts, Tricare paid Fertility Pharmacy at least $393,328.15 for filling compounded cream prescriptions. And Howard kicked back to Stone some

of those Tricare payments.  He did so indirectly through the purchase of alkaline water machines from Stone, which resulted in the manufacturer paying commissions to Stone.  *See supra* at 27–28.

Howard also paid Stone more directly through a series of checks.  During one three-month period, he gave Stone six checks ranging in amounts from $557.70 to $5,115.40.  The memo lines of those checks were telling.  One of them stated "Equipment Sales," and two stated cryptically "Donation," but there was never any explanation for why Howard was "donating" the money to Stone or what equipment he had sold Howard.  Even more telling were the memo lines on each of the other three checks. They stated less cryptically that each of those three payments was a "Finder Fee."  The only thing the evidence shows that Stone ever "found" for Howard was Tricare beneficiaries who could be used by a cooperating doctor, like Bramwell, to write prescriptions that Howard's pharmacy could fill in order to obtain payments from Tricare.  All part of the kickback scheme.

Not only did the checks Howard wrote prove his and Stone's guilt, but so did Howard's words.  One of Howard's employees testified that he had told her that Stone "was getting paid for each patient that he'd bring in."  That is an admission by Howard that he was paying Stone kickbacks.  The same witness also testified that Howard was upset because others he employed were not recruiting patients as well as Stone and he wanted Stone to teach her and another employee how to recruit more patients

for compounded cream prescriptions.  The witness described for the jury how Howard had directed her and a coworker to accompany Stone to a Veterans Administration hospital or medical center so that he could "show [them] how he was bringing in patients."  When the two employees met with Stone, as directed, he "already knew why [they] were there" and "[h]e start[ed] telling [them] what do" to recruit more patients for the prescriptions.  The jury could reasonably find, as it obviously did, that Stone and Howard were working together to boost the number of compounded cream prescriptions coming into Fertility Pharmacy, which would benefit both of them — Howard through greater Tricare payments, and Stone through kickbacks from Howard.

Also telling is the effect that the end of large payments for compounded cream prescriptions had on Stone's patient recruitment efforts.  He had averaged bringing in four new compounded cream patients a week while the higher pay policy was in effect.  But after Tricare stopped paying pharmacies outrageous amounts for filling compounded cream prescriptions, Stone stopped trying to find new patients.  When filling this type of prescription was no longer in Howard's interest, it was no longer in Stone's interest to find patients for whom the prescriptions could be written.  The kickbacks ended.  Between April 14, 2015, and June 8, 2015, Howard had written Stone six checks totaling $20,528.50.  After the Tricare policy changes had their effect, there were no more checks.  In a kickback conspiracy, the kickbacker and kickbackee

work together and profit together.  When the profits end, the kickbacks end as well.  That is what happened here.

All of that evidence supported the jury's finding that Stone knew he was receiving kickbacks: he knew the essential unlawful object of the conspiracy, and he knew Howard was paying him for his role in it.  Which was enough to find him guilty of both the substantive crime of receiving kickbacks and conspiracy to receive health care kickbacks. The same evidence supports Howard's convictions for paying Stone kickbacks and conspiring with him to do so.

### 3.  Howard Laundered Money

As for Howard's money laundering convictions, his challenge rests entirely on his contention that the kickback convictions must be vacated.  In light of our decision to affirm Howard's kickback convictions, his attack on his money laundering convictions necessarily fails.

### III.  THERE WAS NO CONSTRUCTIVE AMENDMENT

Count Four charged Howard with paying one $5,000 kickback to Bramwell on April 1, 2015, but the government presented evidence that he wrote two different $5,000 checks to her on that date.  Howard contends that amounted to a constructive amendment of the indictment.  The government argues that the indictment was not constructively amended because it "charged Howard with paying a $5,000 illegal kickback on April 1, 2015, and the

38                    Opinion of the Court                    18-11602

evidence established the same thing." We agree with the government.

The Fifth Amendment's Due Process Clause guarantees that a defendant can be convicted only of crimes charged in an indictment. *See United States v. Ward*, 486 F.3d 1212, 1226 (11th Cir. 2007). "A constructive amendment occurs when the essential elements of the offense contained in the indictment are altered to broaden the possible bases for conviction beyond what is contained in the indictment." *United States v. Holt*, 777 F.3d 1234, 1261 (11th Cir. 2015) (quotation marks omitted).

Howard's indictment was not constructively amended. Evidence that there were two $5,000 checks that Howard paid to Bramwell on April 1, 2015 did not alter the essential elements of the offense charged in Count Four of the indictment to "broaden the possible bases for [Howard's] conviction." *Id.* (quotation marks omitted). It didn't because the amount of the kickback paid is not an element of the offense. Instead, the essential elements of the offense charged are that Howard "(1) knowingly and willfully, (2) paid money, directly or indirectly, to [Bramwell], (3) to induce her to refer individuals to [Fertility] for the furnishing of [compounded drugs], (4) paid for by [Tricare]." *Vernon*, 723 F.3d at 1252. That the amount of the kickback Howard paid Bramwell on April 1, 2015 was twice as large as the indictment alleged does

not alter those elements, much less broaden them.  There was no constructive amendment.[6]

## IV.  THE SUBSTANTIVE UNREASONABLENESS OF BRAMWELL'S SENTENCE

The government's cross-appeal contends that because the district court did not properly consider or weigh the 18 U.S.C. § 3553(a) factors, Bramwell's sentence — a sentence of probation — is substantively unreasonable.  We agree.

### A.  *The PSR and Sentence Hearing*

The PSR calculated an advisory guidelines range of 78 to 97 months imprisonment for Bramwell.  That range was the product of her total offense level of 28 and her criminal history of I; neither of those components is questioned by either party in this appeal.  The PSR's offense level calculation recommended a $4,399,697 loss amount. The district court eventually found that the loss amount was approximately $900,000 lower.  The revised figure of $3,500,000 is the amount Tricare paid Fertility Pharmacy for filling the prescriptions Bramwell wrote.  That reduction in the loss amount does not, however, affect the guidelines range.

---

[6] Howard's initial brief argued only constructive amendment, but the government preemptively addressed a variance argument in its brief.  Howard then argued variance in his reply brief, but that was too late to properly raise the issue.  *See, e.g.*, *United States v. Evans*, 473 F.3d 1115, 1120 (11th Cir. 2006) ("[A]rguments raised for the first time in a reply brief are not properly before a reviewing court.").

*See generally* U.S.S.G. § 2B1.1(b)(1)(J) (adding 18 levels to the offense level when the loss amount is more than $3,500,000 and less than $9,500,000).

The PSR also recommended, and the court applied, a two-level increase under U.S.S.G. § 3B1.3 for abusing a position of public or private trust.  The PSR did not recommend any offense level decrease for acceptance of responsibility, and the court did not award any because Bramwell never accepted responsibility.

Before us, neither Bramwell nor the government questions the final advisory guidelines range of 78 to 97 months. The government asked the court to impose a sentence within that range, Bramwell asked for a downward variance to probation.

In support of her request for a 78-month downward variance, Bramwell presented more than 50 letters addressed to the judge from relatives, friends, colleagues, and acquaintances who attested to her good personal history, kind acts, and many virtues. And at the sentence hearing, five of the people who had written a letter and two other people made oral statements on her behalf.[7] The seven who made oral statements were her husband, her

---

[7] In some places in the record and the briefs on appeal the statements of those seven people at the hearing are referred to as "testimony," but they are not that. The court gave defense counsel the option of having the seven people sworn in as witnesses on Bramwell's behalf, but he elected not to have that done. Their statements are only statements.

mother, her sister, her pastor, two of her childhood friends, and the mother of a former patient. Through all the letters and oral statements, the district court heard a great deal about Bramwell's background, character, career, and good deeds occurring from her childhood up to her trial and sentencing in this case.

Bramwell also personally addressed the court at sentencing. She told the court that she "still do[esn't] know some of what happened" but that she "need[ed] to take responsibility for what [she] need[ed] to learn from this." She stated that through the "ordeal" she had "learned many lessons" and "built such immense faith." She added: "I, again, apologize for what has happened and for the burden that this has caused, but I have never done anything except for help people. That is what I was born to do."

Bramwell told the court that if she "could do this all over, obviously, in hindsight, [she] would do things differently, so [she was] asking [the court] now for mercy and leniency and [to] allow [her] to be there for [her] family." She pleaded with the court that her elderly mother, her daughter, and her husband needed her around to care for them.

In deciding upon her sentence, the district court pointed out to Bramwell that prescribing compounded cream prescriptions for a "number of patients you had from out of state who you did not see in Florida" was "not a normal, customary way for a doctor to issue a prescription, that is not having some personal contact with the patient." It noted that her "volume of prescrip-

tions" for compounded creams was high "compared to the universe of prescriptions"; that the checks she received from Howard and his companies had their nature "if not concealed, obscured by reference to weight loss seminars"; and that she had stopped writing the prescriptions once Tricare changed its policy, which is "at least one indication that it was not medically necessary, at least the need that was generated through the marketing" which "was turned off when reimbursement changed." In other words, Bramwell was motivated to write compounded cream prescriptions not for the welfare of her patients but to generate revenue for Howard's pharmacy, which would result in Howard paying her kickbacks.

Still, the district court also characterized Bramwell as something of a victim of Howard. It noted that she had left a hospital job to start her own business, which "is really tough," and "[t]hat coincided with [her meeting] Mr. Howard, a gentleman who has virtually no redeeming value and is manipulative and preys on people. And he found a person who was in need, that is, [Bramwell], and he, I would imagine, presented it initially as a perfectly legitimate, no-problem process." The court believed that, if Bramwell had stayed in her hospital job, she would not have committed any crime.

The court then turned to the question of "what sentence is sufficient, but not greater than necessary to comply with the statutory purposes of sentencing." It felt that the government had made "a very compelling argument that any number of ways that

[you] look[ed] at the calculation of sentencing to compare [Bramwell] to Mr. Howard or to compare [her] with Mr. Stone indicate[d] in favor of an incarceration sentence." But the court thought that a variety of factors overcame the government's "very compelling argument" for sentencing Bramwell to "an incarceration sentence."

One of those factors, which the court gave great weight, was Bramwell's personal history and characteristics. The court said it had "looked very closely at the letters" from professional colleagues, patients, friends, and family that Bramwell had submitted and that it had "read every single one." Those letters, and the statements of her witnesses at the sentence hearing, all "portray[ed Bramwell] as a truly remarkable person throughout [her] life."

The court also found that a term of imprisonment, which the guidelines recommended, would provide no deterrence at all. As to specific deterrence, it said that Bramwell had no criminal history and that she had "lived an exemplary life throughout [her] entire life," except, the court must have meant, until she became what the court itself described as "the driving force" in a significant criminal enterprise. Regardless, the court reasoned that she was not likely to commit another crime. ("I look at the need for future deterrence for you. I don't suspect there is any.")

The court reasoned away general deterrence entirely based on its stated belief that "a physician who is involved in this particular type of crime who loses their license and becomes a felon, if

they're going to choose to follow that path, then no sentence [the court] impose[s] will deter them." In other words, there would be no general deterrent value in sentencing Bramwell — and by necessary implication, any physician, pharmacist, attorney, or other professional license holder — to a term of imprisonment.

The court also addressed the gravity of the crime. It initially said that Bramwell's was "a serious crime," and that the evidence "indicate[d] that she was the driving force, at least in terms of writing the prescriptions" in a criminal scheme that was a "significant enterprise." But it also differentiated her crime from other types of health care fraud that it found more serious. The court compared Bramwell's crimes to those where "prescriptions are written for procedures not performed, for services not necessary, and that are just pure out and out fraud. That is not this case. This one's different." The court believed that Bramwell's crime was "somehow uniquely different than an outright fraud for which a prescription is necessary" because hers "was more a matter of generating an interest, generating a client base and then writing the prescriptions to capitalize on that which ended when reimbursement rates changed." Apparently, the court meant it was done to capitalize on a large enough revenue flow that Bramwell could be paid tens of thousands of dollars in kickbacks.

The court addressed the need for Bramwell's sentence to be proportionate to those of her two co-defendants. As for Howard, it noted that he was "the architect" of the scheme, had "showed no remorse," and had even attempted to get a witness to

change testimony.  The court said "there's no comparing [Bramwell] to him."  The court also distinguished her from Stone.  It said Stone "was involved in pure solicitation" and that "[h]e traded on his knowledge of the military and his professed rank as a submarine commander to compel people to seek the benefits that Tricare had to offer."  Stone also had "no history of good works . . . just simply none."

After discussing all of those factors, the court announced the sentence.  It found that the guidelines range of 78 to 97 months imprisonment overrepresented the seriousness of Bramwell's offense.  It varied all the way down from the 78 months at the bottom of the range to zero months imprisonment.  It sentenced Bramwell to three years of probation with one of those years to be served in home detention (with permission to leave for work, medical appointments, and that type of thing), and no fine, though restitution was ordered later.

The court explained to Bramwell her sentence: "It is a variance and the variance is for the reasons I've identified, which is the lack of your criminal history, the fact that you have collateral consequences that are significant — you will likely lose your license, you'll be a convicted felon going forward — and the fact that this seems to be aberrant."  About her criminal conduct being aberrant, the court acknowledged that her crime "was not a one-time instance" and was committed over a "lengthy period of time" but concluded that it was "nonetheless, aberrant behavior

from the way you've lived your life." The government objected that the sentence was substantively unreasonable.

## B. *Analysis*

When sentencing a criminal defendant, district courts are required to consider the advisory guidelines range and the factors set forth in 18 U.S.C. § 3553(a). *See United States v. Rosales-Bruno*, 789 F.3d 1249, 1253–54 (11th Cir. 2015). "The district court's task is to impose a sentence that will adequately (1) 'reflect the seriousness of the offense,' (2) 'promote respect for the law,' (3) 'provide just punishment,' (4) 'afford adequate deterrence,' (5) 'protect the public from further crimes of the defendant,' and (6) provide the defendant with any needed training and treatment in the most effective manner." *Id.* (quoting 18 U.S.C. § 3553(a)(2)). "The task is a holistic endeavor that requires the district court to consider a variety of factors: (1) the nature and circumstances of the offense, (2) the defendant's history and characteristics, (3) the kinds of sentences available, (4) the applicable sentencing guidelines range, (5) pertinent policy statements of the Sentencing Commission, [(6)] the need to provide restitution to any victims, and [(7)] the need to avoid unwarranted sentencing disparities." *Id.* at 1254 (citing 18 U.S.C. § 3553(a)).

The court is not required to give all of the § 3553(a) sentencing factors equal weight. *Id.* In its sound discretion, the court may give "great weight to one factor over others," *id.*, but only if it is reasonable to do so. And though the sentencing guidelines are only advisory, a major variance from the guidelines range

"should be supported by a more significant justification than a minor one," and a court must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall v. United States*, 552 U.S. 38, 50 (2007); *see also United States v. Irey*, 612 F.3d 1160, 1196 (11th Cir. 2010) (en banc) ("Although there is no proportionality principle in sentencing, a major variance does require a more significant justification than a minor one . . . .").

We review only for an abuse of discretion the substantive reasonableness of a sentence. *Irey*, 612 F.3d at 1188–91. But "[l]ooking at sentencing decisions through the prism of discretion is not the same thing as turning a blind eye to unreasonable ones." *Id.* at 1191. As we have emphasized, "the district court's choice of sentence is not unfettered." *United States v. Pugh*, 515 F.3d 1179, 1191 (11th Cir. 2008). "The fetters on a district court's sentencing discretion are the requirement of reasonableness and the existence of appellate review to enforce that requirement. While those fetters are loosened by the substantial discretion we afford district courts in sentencing, at the boundaries of reasonableness the fetters do fetter." *Irey*, 612 F.3d at 1191. The Supreme Court has succinctly described our role in sentence review: "At times, [district courts] will impose sentences that are unreasonable. Circuit courts exist to correct such mistakes when they occur." *Rita v. United States*, 551 U.S. 338, 354 (2007).

"A district court abuses its discretion [in sentencing] when it (1) fails to afford consideration to relevant factors that were due

significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors." *Irey*, 612 F.3d at 1189 (quotation marks omitted). A court "commits a clear error of judgment when it considers the proper factors," but "weighs those factors unreasonably, arriving at a sentence that does not 'achieve the purposes of sentencing as stated in § 3553(a).'" *Id.* (quoting *Pugh*, 515 F.3d at 1191). We will vacate a sentence on that ground if, and only if, we "are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." *Id.* at 1190 (quoting *Pugh*, 515 F.3d at 1191).

We are left with that definite and firm conviction here. Of the three general ways we've articulated that a district court could abuse its discretion when sentencing — failing to afford consideration to relevant factors, giving significant weight to an improper factor, and committing a clear error of judgment in considering proper factors and the weight they were due — the court engaged in each one in this case.

### 1. The Failure to Properly Consider the Relevant Factors of the Seriousness of the Offense, the Need to Promote Respect for the Law, and the Need to Provide Just Punishment for the Offense

At the sentence hearing, the district court acknowledged that Bramwell's criminal conduct was serious, noting that "she was the driving force [of the scheme], at least in terms of writing

the prescriptions," and that the evidence indicated Bramwell's "awareness that this was a significant enterprise that was being undertaken." The court recounted the details of her extensive role, including that she had appeared in a promotional video for Howard and the several ways in which the prescriptions she wrote were of a questionable nature. The court also acknowledged that she had written 394 prescriptions, which amounted to more than $3,500,000 in loss to Tricare.

Even though the court did state that Bramwell had committed "a serious crime," it also diminished the seriousness of her health care crimes (receiving kickbacks and conspiring to do so), comparing them to another type, which involves prescriptions written for unperformed procedures and unnecessary services "that are just pure out and out fraud." The court stated: "That is not this case. This one's different." What Bramwell did, the court reasoned, was "more a matter of generating an interest, generating a client base and then writing the prescriptions to capitalize on that which ended when reimbursement rates changed." That description of her conduct leaves out the fact that she received $138,500 in kickbacks for writing the prescriptions.

Along those lines, the court asked the prosecutor how what Bramwell did was different from ophthalmologists who advertise Lasik eye surgery. Why, the court wanted to know, did Bramwell's conduct not amount to meeting people's medical needs with medications that they had not known existed? The prosecu-

tor answered that ophthalmologists who advertise Lasik services are not running a significant multi-million-dollar criminal enterprise based on health care kickbacks.  They are not conspiring to commit, and are not committing, federal crimes.

Not only that, but as the district court itself seemed to recognize elsewhere in its remarks, Bramwell and her co-conspirators were not driven by their desire to serve medical needs.  *See supra* at 34.  Any idea that Bramwell was acting primarily to meet the medical needs and best interest of her patients — which would *not* have been a defense to violating the anti-kickback statute — is refuted by one loud fact.  After 14 months of promoting and writing prescriptions for compounded creams at an average rate of about one a day, Bramwell abruptly stopped when Tricare stopped paying pharmacies exorbitant amounts to fill those prescriptions.  *See supra* at 33–35.  When the source of revenue Howard used to pay Bramwell kickbacks dried up, the kickbacks did too, and so did the flow of prescriptions from her.

Bramwell was motivated by the $138,500 in illegal payments she received from Howard for the 394 compounded cream prescriptions she sent his pharmacy over a period of 14 months.  The district court implicitly recognized as much when it expressed the belief that Bramwell would not have joined the conspiracy if she had not been in financial difficulty and needed the kickbacks.  And those kickbacks came in the form of 34 checks

"disguised" (to use the district court's word) to look as though they were for legitimate purposes.

The district court's decision to sentence Bramwell to probation evidences its failure to give sufficient weight to the seriousness of her crimes. We have held that a sentence of probation with some home detention is a substantively unreasonable sentence for other defendants who have committed white-collar crimes, even when those defendants' crimes didn't last as long or result in as much loss as Bramwell's did. For example, when a defendant pleaded guilty to one count of making a false statement for the purpose of receiving credit from a bank, in violation of 18 U.S.C. § 1014, we said the scheme "was a serious one." *United States v. Crisp*, 454 F.3d 1285, 1286, 1290 (11th Cir. 2006); *see id.* at 1287–88, 1292 (vacating as substantively unreasonable a sentence of five hours of imprisonment and five years supervised release with 12 months of it to be served in home detention). That scheme extended over a period of approximately 8 months and the loss amount of the victim bank totaled less than a half million dollars. *Id.* at 1290.

Bramwell's crime, by contrast, continued for more than a year and inflicted a loss that was seven times greater than the one in the *Crisp* case. Bramwell's crime also caused more loss than in *United States v. Kuhlman*, 711 F.3d 1321 (11th Cir. 2013), a health care fraud case where we rejected as substantively unreasonable a non-incarceration sentence. *Id.* at 1324, 1330 (vacating a probation and community service sentence as substantively unreason-

able when the loss amount was $2,944,883); *see also United States v. Hayes*, 762 F.3d 1300, 1302 (11th Cir. 2014) (vacating as substantively unreasonable a sentence of probation with six to twelve months of home detention where the defendant paid $600,000 in bribes and made $5,000,000 in profit).

What we said in the *Crisp* case applies here as well: "For such a serious offense, however, [Bramwell] did not receive so much as a slap on the wrist — it was more like a soft pat." 454 F.3d at 1291; *cf. Kuhlman*, 711 F.3d at 1328 ("He stole nearly $3 million and 'did not receive so much as a slap on the wrist—it was more like a soft pat.'") (quoting *Crisp,* 454 F.3d at 1291).

White collar medical crimes like Bramwell's are serious because they can disrupt health care markets. *See Kuhlman*, 711 F.3d at 1328. Even if every prescription she wrote were medically appropriate and Bramwell was only ginning up patients for whom she could write non-fraudulent prescriptions in return for payments from a pharmacist, that kind of criminal conduct skews the health care market by distorting its incentive structure. Congress has determined that medical necessity and the best interest of the patient should be the *only* reason for a physician to write a prescription; kickbacks provide a baser, non-medical reason: making unauthorized money and lots of it. A physician who is paid under the table by a pharmacy for writing prescriptions that it fills has an incentive to write more prescriptions, or more costly ones, than she would if acting only in the best medi-

cal interests of her patients. There is no medical necessity exception to the law forbidding kickbacks. *See* 42 U.S.C. § 1320a-7b(b).

Anti-kickback laws exist to prevent the perversion of incentives, to ensure that actors, such as those in the health field, act for the proper reasons, to avoid a conflict of interest when it comes to the exercise of medical judgment. *See United States v. Patel*, 778 F.3d 607, 617 (7th Cir. 2015) ("[T]he prospect of a kickback gave [the defendant] an increased incentive to charge Medicare for these services — exactly the type of incentive that Congress sought to eliminate by passing the Anti-Kickback Statute."); *cf. United States ex rel. Obert-Hong v. Advocate Health Care*, 211 F. Supp. 2d 1045, 1050 (N.D. Ill. 2002) ("The Stark and Anti–Kickback statutes are designed to remove economic incentives from medical referrals . . . .").

The sentence of probation with some home detention that the district court imposed does not reflect the seriousness of the offense, does not promote respect for the law, and does not provide just punishment. *See* 18 U.S.C. § 3553(a)(2)(A).

## 2. The Failure to Properly Consider the Relevant Factor of General Deterrence

In "determining the particular sentence to be imposed," a sentencing court is required to consider, among other factors, "the need for the sentence imposed . . . to protect the public from further crimes of the defendant," *id.* § 3553(a)(2)(C), and "to afford adequate deterrence to criminal conduct," *id.* § 3553(a)(2)(B). Those sentencing factors cover both specific deterrence and gen-

eral deterrence. *See Irey*, 612 F.3d at 1210–13. As for specific deterrence, the court found that there was little or no likelihood that Bramwell would commit the same or similar crimes again. The government does not dispute that finding.

The problem is with general deterrence. The district court reasoned away the statutory command that it consider the need for Bramwell's sentence to have a general deterrent effect, as completely as if it had erased that requirement from the Sentencing Act. To justify its decision not to give that factor any role in sentencing doctors who commit health care crimes, the court stated that if the prospect of losing their medical license and becoming a felon is not enough to deter doctors from committing such crimes, the threat of a prison sentence could not deter them from committing the crimes either. Its exact words were: "I think a physician who is involved in this particular type of crime who loses their license and becomes a felon, if they're going to choose to follow that path, then no sentence I impose will deter them." Therefore, the reasoning goes, general deterrence may be, and should be, disregarded entirely when the criminal or would-be criminal is a doctor. Which is what the court did.

The court's reasoning would mean that not just doctors, but also pharmacists, and lawyers, and all other professionals who hold licenses, cannot be deterred by the threat of a prison sentence from committing a crime that will result in loss of their license anyway. And for that reason, in these kinds of cases it would mean § 3553(a)(2)(B)'s command that sentencing courts

18-11602                Opinion of the Court                55

factor in the need for general deterrence can be skipped where the defendant was a professional who used or abused her license to commit the crime.

If the district court's ruling were approved, it would effectively blue pencil out of the United States Code for professionally licensed defendants an imperative that Congress wrote into it. It would tell judges not to consider general deterrence when sentencing any criminals who used their professional license or privilege to commit their crime. Anyone with a license to practice a profession could abuse the privileges that come with that license to commit crimes without fear of being sent to prison in order to deter others from using their licenses to commit similar crimes. That cannot be right, and it isn't right.

Congress, the United States Sentencing Commission, and this Court have all decided that general deterrence is a critical factor that must be considered and should play a role in sentencing defendants, including those who wear white collars and practice a profession. *See, e.g.*, *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("[T]he Congress that adopted the § 3553 sentencing factors emphasized the critical deterrent value of imprisoning serious white collar criminals, even where those criminals might themselves be unlikely to commit another offense[.]"); *see generally Kuhlman*, 711 F.3d at 1328–29 (collecting cases that have held non-incarceration sentences for white-collar crimes to be substantively unreasonable). We have emphasized that "[p]lainly, general deterrence is one of the key purposes of sentencing." *United*

*States v. McQueen*, 727 F.3d 1144, 1158 (11th Cir. 2013) (cleaned up); *see also Irey*, 612 F.3d at 1193 ("General deterrence is one of the key purposes of sentencing, and the district court abused its discretion when it failed to give that matter its proper weight.") (quoting *United States v. Camiscione*, 591 F.3d 823, 834 (6th Cir. 2010)).

General deterrence is more apt, not less apt, in white collar crime cases. The reason is that "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity," which makes them "prime candidates for general deterrence." *Kuhlman*, 711 F.3d at 1329 (quoting *Martin*, 455 F.3d at 1240). White collar criminals "often calculate the financial gain and risk of loss" of their crimes, and an overly lenient sentence sends the message "that would-be white-collar criminals stand to lose little more than a portion of their ill-gotten gains and practically none of their liberty." *Martin*, 455 F.3d at 1240; *see also United States v. Brown*, 880 F.3d 399, 405 (7th Cir. 2018) (agreeing with the "widely accepted principle" that white collar crimes are "prime candidates for general deterrence").

As we said of the defendant in the *Martin* case: "The fact that [his] guidelines range was 108–135 months' imprisonment evinces Congress's attempt to curb judicial leniency in the area of white collar crime. The district court's 7-day sentence not only fails to serve the purposes of § 3553, but even worse, undermines those purposes." 455 F.3d at 1240. The same is true in this case. The fact that Bramwell's guidelines range was 78 to 97 months

evinces Congress' purpose to curb judicial leniency in white collar crime cases, and it shows that her sentence of no jail time at all interferes with that purpose. Leniency undermines general deterrence, and the extreme leniency of a probation sentence undermines it extremely. *See Kuhlman*, 711 F.3d at 1329. It sends the wrong message and sends it loudly and clearly.

What is true of white collar crimes generally is no less true of health care crimes in particular. Just as "[i]nsurance companies must rely on the honesty and integrity of medical practitioners in making diagnoses and billing," *id.* at 1328, the government must rely on them when it's administering health care programs like Tricare. As one Navy Captain from the Defense Health Agency testified in this case, because Tricare doesn't want to put red tape in the way of veterans getting the care that they need, "the system is based on trust." We've also noted that "health care fraud is so rampant that the government lacks the resources to reach it all," *id.*, and the same is no less true of crimes involving government health care programs like Tricare. That is apparent from the Tricare compounded cream craze and the facts of this case. *See supra* at 3–5, 9–10.

All of those considerations establish that "when the government obtains a conviction" in a health care kickback prosecution, "one of the primary objectives of the sentence is to send a message" to others who contemplate such schemes that their crime is a serious one "that carries with it a correspondingly serious punishment." *Kuhlman*, 711 F.3d at 1328. A sentence of pro-

bation, whether or not coupled with a period of home detention, is insufficient. As we have explained: "The threat of spending time on probation simply does not, and cannot, provide the same level of deterrence as can the threat of incarceration in a federal penitentiary for a meaningful period of time." *Id.* (quotation marks omitted). "In awarding [Bramwell] probation . . . the district court disregarded the importance of delivering" the message to other health care providers that her crime was a serious one. *Id.*

In writing off general deterrence as a sentencing purpose when it comes to doctors who commit health care crimes, the district court undermined "one of the primary objectives of the sentence" in such a case. *Id.* That fundamental error contributed to the unreasonable sentence the court imposed.

### 3. The Decision to Give Weight to the Improper Factors of Loss of Professional License, Convicted Felon Status, and the Temptation and Opportunity to Commit the Crime

#### a. Loss of Professional License

The district court gave significant weight to the fact that Bramwell would — as she ultimately did — lose her medical license. Although the court did not specify which § 3553(a) sentencing factor the loss of license was relevant to, it apparently had in mind the factor of "just punishment for the offense." *See* 18 U.S.C. § 3553(a)(2)(A). The theory appears to have been that loss of her medical license was a collateral effect of Bramwell's con-

viction, which serves to punish her, thereby lessening the need to use imprisonment as punishment.

One concern that arises from discounting the need for (or length of) a prison term when the defendant loses a professional license upon conviction is that the only defendants who benefit from a lesser sentence on that ground are those who have a professional license to lose. And there is some correlation between professional licenses and socio-economic standing, which poses the risk of building in lower sentences for those in higher socio-economic groups. That would not be a good revision of the guidelines.

"The Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status." *Kuhlman*, 711 F.3d at 1329. We have held that it is "decidedly inappropriate" for a district court to rely "on the defendant's chosen profession and status in the community" to justify a large downward variance. *Id.* (quotation marks omitted). Such lenient sentences "are typically unavailable to defendants of lesser means who are convicted of economic crimes." *Id.* We have "encourage[d] our district court colleagues to keep in mind" that "[c]riminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime." *Id.* (quotation marks omitted). And the distribution of professional licenses correlates with education and training.

We are aware of the Supreme Court's decision in *Koon v. United States*, 518 U.S. 81 (1996). That was a pre-*Booker* (pre-variance era) case involving police officers convicted for violating the civil rights of a suspect by using excessive force. *Id.* at 88. The district court had departed downward on the ground that the defendants would lose their employment and tenure as police officers and not be able to work in law enforcement again. *Id.* at 109. The Supreme Court rejected the argument that a downward departure could never be appropriate based on the conviction's impact on the defendant's career. It said: "[A] defendant's career may relate to his or her socioeconomic status, but the link is not so close as to justify *categorical exclusion* of the effect of conviction on a career." *Id.* at 110 (emphasis added). The Court added that "socioeconomic status and job loss are not the semantic or practical equivalents of each other." *Id.*

Although the Supreme Court did reject the downward departure in the *Koon* case on other grounds, *see id.* at 110–11, 113–14, the import of the words we have quoted from its opinion is that in some circumstances it may be proper to consider in sentencing the effect that the conviction will have on the defendant's position and career. But what circumstances?

We faced that question the next year in a case with facts much closer to the present one than the facts in the *Koon* case are. The defendant in our *Hoffer* case was a physician who lost his medical license because he was convicted of felonies that resulted from use of his prescription writing authority. *United*

*States v. Hoffer*, 129 F.3d 1196, 1198–99 (11th Cir. 1997). He had pleaded guilty to conspiring to illegally dispense controlled substances and to tampering with a witness. *Id.* at 1199. One of the conditions of the plea bargain was that he surrender his medical license and agree to never apply to be a physician again. *Id.* At sentencing, the district court departed downward four levels based in part on the defendant's "loss of the privilege to practice medicine." *Id.* at 1199, 1205. That's close to what we have here.

In deciding whether that downward departure in *Hoffer* was proper, we assessed the *Koon* decision and the Supreme Court's statement that the effect of a conviction on a defendant's career is not categorically excluded from consideration in sentencing. This is what we said:

> The clear implication of the Supreme Court's statement is that collateral employment consequences could, under some set of circumstances, serve as a basis for a departure from the sentencing guidelines. The Court did not specify what those circumstances were. We will not speculate about all of the possibilities, either. It is enough for present purposes that the *Koon* Court did not indicate that the loss of an employment or career position could be a basis for departure where that loss was the direct result of the defendant abusing the trust inherent in that very position, an abuse of trust for which the guidelines require an enhancement.

*Id.* at 1204.

Because the defendant's base offense level in *Hoffer* had been enhanced under U.S.S.G. § 3B1.3 for using his special skills as a physician to facilitate the commission of his crimes and abusing his position of trust as a physician, we held that the downward departure for loss of his medical license was improper. *Id.* The way Hoffer had abused his position of trust and his privileges as a physician is similar to the way Bramwell abused hers:

> Hoffer betrayed society's trust by using his prescription writing privileges to distribute controlled substances outside the legitimate practice of medicine. It was because Hoffer was a physician, and was entrusted as a physician with prescription writing authority, that he was able to commit the crimes for which he was convicted.

*Id.* Bramwell did not unlawfully distribute controlled substances, but she did "betray[] society's trust by using [her] prescription writing privileges to" fuel a kickback scheme. *Id.* As in *Hoffer*, it was only "because [Bramwell] was a physician, and was entrusted as a physician with prescription writing authority, that [she] was able to commit the crimes for which [she] was convicted." *Id.* And Bramwell, like Hoffer, had her offense level enhanced because she abused her position of trust as a physician to commit her crimes.

In our *Hoffer* opinion we looked to the background notes to U.S.S.G. § 3B1.3, which were relevant because:

The Commission, in § 3B1.3, stated that circumstances such as these warrant a sentence enhancement. In the background notes to § 3B1.3, the Commission explained that persons who abuse their positions of trust or use their special skills to facilitate or conceal the commission of a crime "generally are viewed as more culpable." Yet, the district court's treatment of the position of trust Hoffer enjoyed, his medical license and physician status, netted out to a lesser sentence for him. The court gave Hoffer a four-level downward departure for losing his position of trust, which more than wiped out the two-level enhancement mandated by § 3B1.3 for Hoffer's abuse of that position of trust.

Society, employers, and licensing authorities usually view abuse of a position of trust to commit or facilitate crimes as misconduct warranting loss of that position of trust. As a result, in virtually every case in which a § 3B1.3 enhancement is warranted, there will also be a loss of a position of trust. The two sanctions or results are inextricably intertwined. Allowing downward departures for loss of professional or employment position in cases in which that loss flows from an abuse of trust that warrants a § 3B1.3 enhancement would nullify the mandate of § 3B1.3. The Commission cannot have intended such a result.

*Id.* at 1204–05. There has been no material change in the guideline or the background notes since we wrote that in the *Hoffer* deci-

sion, apart from the fact that the guidelines are no longer manda-tory.  *See* U.S.S.G. § 3B1.3 cmt. background.

While *Hoffer* dealt with a downward departure and this case involves a downward variance, similar principles come into play.  It would not make sense to prescribe the § 3B1.3 upward enhancement in the offense level for abuse of a position of trust through misuse of a medical or other professional license, and then allow that enhancement and the reason for it to be wiped out (or more) solely because of the resulting revocation of that same license.  Whatever circumstances may weigh in favor of a downward variance because of the impact the conviction has on a defendant's career prospects, loss of a professional license that was abused in the course of committing the crime is not one of them.

As *Hoffer* illustrates, the reasoning behind § 3B1.3 is that defendants who abuse a position of trust deserve more severe punishment, not less.  *Cf. United States v. Mateos*, 623 F.3d 1350, 1366, 1369 (11th Cir. 2010) (affirming a substantial upward vari-ance in sentencing a doctor for health care fraud crimes because of several "compelling justifications," one of which was that "a doctor should be punished more severely than other participants because the doctor is breaching a position of trust and an ethical obligation to put the patient's interest first").  Applying that rea-soning behind § 3B1.3 to medical doctors is also consistent with Congress' command to the Sentencing Commission to review the guidelines and policy statements for Federal health care offenses

18-11602              Opinion of the Court                    65

to "ensure that the Federal Sentencing Guidelines and policy statements . . . reflect the serious harms associated with health care fraud and the need for aggressive and appropriate law enforcement action to prevent such fraud." Patient Protection and Affordable Care Act of 2010, Pub. L. No. 111–148, § 10606(a)(3)(A), 124 Stat. 119, 1007 (March 23, 2010). Granting doctors a downward variance because they lose the medical license they abused to commit their health care crimes would be in serious tension with that congressional command.

A district court may sometimes "vary from the guidelines based solely on its judgment that the policies behind the guidelines are wrong." *Irey*, 612 F.3d at 1212; *see also Kimbrough v. United States*, 552 U.S. 85, 105–09 (2007) (holding that variances can sometimes be based on the sentencing judge's disagreement with whether a guideline properly reflects the § 3553(a) factors); *Spears v. United States*, 555 U.S. 261, 264 (2009) ("[*Kimbrough* recognized] district courts' authority to vary from the crack cocaine Guidelines based on [a] *policy* disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case."). But a variance based on "such a disagreement is permissible only if a District Court provides sufficiently compelling reasons to justify it." *Irey*, 612 F.3d at 1211 (quotation marks omitted).

That restriction applies because the Sentencing Commission and the district court have "different strengths [that] affect the amount of respect due a court's decision to vary from the

guidelines range." *Id.* at 1188. The Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." *Kimbrough*, 552 U.S. at 109 (quotation marks omitted). Generally, its "recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3353(a)'s objectives." *Id.* (quotation marks omitted). "The sentencing judge, on the other hand, has greater familiarity with the individual case and the individual defendant before him than the Commission or the appeals court." *Id.* (quotation marks and ellipsis omitted). That familiarity puts the district court "in a superior position to find facts and judge their import under § 3353(a) in a particular case." *Id.* (quotation marks omitted).

The result of those "discrete institutional strengths" is that "a district court's decision to vary from the advisory Guidelines may attract greatest respect when the sentencing judge finds a particular case outside the heartland to which the Commission intends individual Guidelines to apply." *Id.* (quotation marks omitted). By contrast, "closer review may be in order when the sentencing judge varies from the Guidelines based solely on the judge's view that the Guidelines range fails properly to reflect § 3553(a) considerations even in a mine-run case." *Id.* (quotation marks omitted) That is what we have here.

By varying downward because Bramwell lost her license to practice medicine, the district court expressed its disagreement with the guidelines policy of imposing greater sentences on de-

fendants who misuse their professional license. As we recognized in *Hoffer*, "in virtually every case in which a § 3B1.3 enhancement is warranted, there will also be a loss of a position of trust." 129 F.3d at 1205. The district court's theory — that the loss of her medical license was a collateral effect of Bramwell's conviction, which serves to punish her, thereby lessening the need to use imprisonment as punishment — would apply in every case in which a defendant with a professional license abuses a position of trust bestowed by that license. This case, and the multitude of others like it, is squarely within the heartland of cases to which § 3B1.3 applies. *Cf. Irey*, 612 F.3d at 1203 ("The district court's reliance on the theory that pedophiles have reduced volition, applying as it does to virtually all crimes involving sexual abuse of children, does not take this case outside the heartland to which the Commission intended the guidelines relating to sexual offenses against children to apply.").

The district court's decision to vary downward based in part on Bramwell's loss of the medical license and privilege that she abused in committing the crime does not stand up to the "closer review" that *Kimbrough* authorizes in a mine-run case like this one. In *Kimbrough*, the district court varied downward from the guidelines range for crack cocaine offenses, under which a crack cocaine dealer was "subject to the same sentence as one dealing in 100 times more powder cocaine." 552 U.S. at 91. The government argued that the sentencing court lacked the discretion to deviate from that 100-to-1 sentencing ratio because it was

mandatory. *See id.* at 101–02, 111. The Supreme Court rejected that argument, pointing out that the Commission itself had taken the "consistent and emphatic position that the crack/powder disparity [was] at odds with § 3553(a)." *Id.* at 111. Under the circumstances, the Court held that it was not an abuse of discretion for the district court to impose a substantial downward variance. *Id.* at 110, 111.

By contrast, in *Irey* the district court's "conclusory statement of personal belief" about pedophilia did not provide a "sufficiently compelling reason[] to justify" a downward variance. 612 F.3d at 1211–12 (quotation marks omitted). We concluded that the "district court made a clear error of judgment in downplaying the importance of deterring [sex crimes against children]." *Id.* at 1212. We also rejected as unreasonable "the district court's view that the guidelines involving sex crimes against children are too harsh in a mine-run case because pedophiles have impaired volition." *Id.* at 1203; *see also Pugh*, 515 F.3d at 1201 n.15 (rejecting a probation-only sentence that was based on the district court's policy disagreement with the guidelines because the guidelines sentences for child pornography crimes "do not exhibit the deficiencies the Supreme Court identified [in the crack cocaine guidelines] in *Kimbrough*").

The district court did not provide a sufficiently compelling reason to justify a downward variance based on Bramwell's loss of her medical license. It stated only that losing a medical license is a "collateral consequence[] that [is] significant." That conclusory

statement does not justify rejecting the Sentencing Commission's policy determination that a criminal who abuses a position of trust to facilitate the commission of her crime should be subject to a guidelines enhancement. *See* U.S.S.G. 3B1.3 cmt. background ("This adjustment applies to persons who abuse their positions of trust or their special skills to facilitate significantly the commission or concealment of a crime."); *Cf. Hoffer*, 129 F.3d at 1204–05. That is especially true with medical licenses given the congressional command regarding health care crimes that we have already discussed. *See supra* at 65–66.

Exercising the review permitted by *Kimbrough*, "we reject as unreasonable and a clear error in judgment the district court's view that the guidelines involving [the abuse of a medical license] are too harsh in a mine-run case" simply because the doctor will lose her license as a result of her felony conviction. *Irey*, 612 F.3d at 1203.

As we held in *Hoffer*, we also hold here: "the district court abused its discretion by granting [Bramwell] a downward [variance] based upon loss of [her] privilege to practice medicine." 129 F.3d at 1206; *accord United States v. Steele*, 178 F.3d 1230, 1239 (11th Cir. 1999) (holding that it was an abuse of discretion for the district court to grant a downward departure based on the loss of a pharmacist license when that departure would negate an enhancement imposed for the defendant's abuse of his position as a pharmacist); *see also United States v. Musgrave*, 761 F.3d 602, 608 (6th Cir. 2014) (holding it was impermissible for a court in

sentencing a defendant for bank fraud to consider collateral con-
sequences such as "the likely loss of his CPA license"); *cf. Mateos*,
623 F.3d at 1366.

### b. Convicted Felon Status

In urging the court to give Bramwell a sentence of proba-
tion, defense counsel argued that: "The Court can also consider
all the other collateral consequences that she will have to live with
for the rest of her life as a convicted felon, as a basis for granting a
downward departure or variance."  The court accepted that invi-
tation.  In the list of reasons it gave Bramwell for varying all the
way down to a sentence of probation for her, the court included
the fact that she would "be a convicted felon going forward."

The problem with using felon status to support a down-
ward variance is that all but a tiny percentage of those to whom
the sentencing guidelines are applied will be "a convicted felon
going forward."  Bramwell was sentenced in May of 2018.  Of the
68,664 defendants who were sentenced under the guidelines that
fiscal year, 65,724 or 95.7% were sentenced for committing felo-
nies. *See* U.S. Sent'g Comm'n, *2018 Annual Report and Source-
book of Federal Sentencing Statistics* 42 (2019).  A factor that ex-
ists in more than nineteen out of twenty cases is not a proper ba-
sis for varying upward or downward from the guidelines range.  It
is just an expected, ordinary, everyday fact of life for defendants
sentenced under the guidelines.

c. Temptation and Opportunity to Commit the Crime

The district court also appears to have given weight to another improper factor in deciding to vary from the guidelines range of 78 to 97 months all the way down to zero months. The court was of the view that Bramwell was a victim of Howard, who preyed on her in a time of financial need. As we have mentioned, the court pointed out Bramwell was in a "really tough" position financially, having left a hospital job to start her own business. She met Howard, whom the court characterized as "a gentleman who has virtually no redeeming value and is manipulative and preys on people." The court speculated (saying "I would imagine") that Howard initially presented the kickback scheme "as a perfectly legitimate, no-problem process" to Bramwell, who was a person "in need." If only Bramwell had stayed in her hospital job, the court believed, she would not have needed the kickback money and would not have committed any crime.

We accept as fact that Bramwell would not have committed the crimes of conspiring to take and of taking kickbacks if she had not needed money. But that hardly sets her apart from others who have been convicted of financial crimes in the health care world or elsewhere. We also accept that she would not have given in to temptation if the temptation had not existed and an opportunity had not been presented. But the same can be said generally of many, if not most, criminals, especially white collar ones.

Oscar Wilde advised that, "The only way to get rid of a temptation is to yield to it." Oscar Wilde, *The Picture of Dorian*

*Gray and Selected Stories* 35 (Signet Classic 1962) (1891). That witticism may contain enough ironic truth to prompt a smile, but it is not a principle that has a home in the Sentencing Act or in binding precedent. A major downward variance to a sentence of probation cannot be justified by the fact that Bramwell was tempted by financial need and was given an opportunity to commit the crime.

4. The Unwarranted Disparity Between Bramwell's Sentence and that of Stone and Defendants in Other Cases Convicted of Similar Crimes

Among the factors that a sentencing court must consider is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). We've identified the factor of unwarranted disparities as "a particularly important one when reviewing the substantive reasonableness of a sentence because one of the primary purposes of appellate review of sentences is to iron out differences in order to avoid undue disparity." *Irey*, 612 F.3d at 1219.

Co-defendant Stone had a guidelines range of 33 to 41 months. The court varied downward nine months to sentence him to 24 months imprisonment. Yet the court sentenced Bramwell, who had a guidelines range of 78 to 97 months, to 0 months imprisonment. The court varied downward the full 78 months for Bramwell, but only 9 months for Stone. The court sentenced

Stone, a wheel-chair bound, disabled veteran, to serve two years in prison. It sentenced Bramwell to serve not a single day.

This disparity is unwarranted and all the more glaring when the objective metrics of their criminal conduct are compared. The duration of criminal behavior, the loss amount inflicted, and the ill-gotten gains obtained all point in one direction, but the substantial difference in the sentences the court imposed runs in the opposite direction. Comparing the duration of their criminal behavior, the court found that Stone was involved in the criminal scheme for four months. Bramwell was involved in it for 14 months — three-and-a-half times longer. Comparing the loss amount they inflicted, Stone was involved in $393,328 or 9 percent of the total loss, Bramwell was involved in $3,560,804 or 81 percent of the total loss — nine times more. *See Crisp*, 454 F.3d at 1291 (noting that "along with other relevant factors under the guidelines, *loss serves as a measure of the seriousness of the offense and the defendant's relative culpability*") (quoting U.S.S.G. § 2B1.1 cmt. background). Comparing their ill-gotten gains, Stone received $20,528 in kickbacks, while Bramwell received $138,500 — nearly seven times more. The sentencing guidelines took those substantial differences into account, which is why Bramwell's guidelines range was more than twice as high as Stone's. Bramwell's wrongdoing dwarfed Stone's. But the court sent Stone, and not Bramwell, to prison.

It is true that a difference in sentences is not unwarranted if meaningful differences in the co-defendants' conduct and situa-

tions justify it. *See, e.g., United States v. Duperval*, 777 F.3d 1324, 1338 (11th Cir. 2015). There are differences between Bramwell and Stone, but most of them actually weigh heavily against Bramwell receiving a dramatically lighter sentence than Stone did. As we have just described, the significant differences in their involvement in the criminal scheme — measured by how long they participated, how much loss they inflicted, and how much money they made from the criminal conduct — all point toward a longer sentence for Bramwell than for Stone.

Consider also the district court's own, accurate finding about Bramwell's role in the criminal enterprise. The court found that "she was the driving force [of the scheme], at least in terms of writing the prescriptions." And, of course, writing the prescriptions was at the core of the criminal enterprise. The enterprise couldn't have happened, at least not near the level it did, without the role she played as the driving force. And she energetically performed that critical role for 14 months, writing 394 compounded cream prescriptions, which amounted to 81 percent of the enterprise's total. And Tricare paid Fertility Pharmacy $3,560,804 to fill the prescriptions she wrote.

Unlike Bramwell, Stone didn't write any prescriptions; he couldn't. He was just a recruiter, and he was one for only four months. He was held accountable for recruiting only sixteen of the patients for whom Fertility filled compounded cream prescriptions.

Even though the district court recognized that Bramwell was the driving force behind the criminal scheme, it still thought she deserved a lighter sentence than Stone. The court pointed out that Stone "was involved in pure solicitation" and "traded on his knowledge of the military and his professed rank as a submarine commander to compel people to seek the benefits that Tricare had to offer." The use of the term "compel" is inaccurate in this context. There is no evidence that Stone compelled any Tricare beneficiary to go to Bramwell or any other physician for a compounded cream prescription. He was in no position to compel anyone. Stone did persuade and influence people to obtain those prescriptions, just as Bramwell influenced and persuaded many of them to let her write them. But persuasion is not compulsion.

In addition to being the criminal enterprise's driving force as prescription-writer-in-chief, Bramwell also did her part in recruiting patients. She appeared in a promotional video for Howard's deceptively named "Tricare Wellness Program." She also used her own weight loss program to proselytize about compounded creams, which have nothing to do with weight loss. She called Tricare-eligible patients that Howard's call center employees had identified as prospects and, even though they were not her patients, she persuaded some to let her write compounded cream prescriptions for them.

The district court pointed out that Stone "traded on his knowledge of the military and his professed rank . . . to compel

people." But even if persuasion through knowledge and position amounts to compulsion, Bramwell did the same, using her knowledge of medicine and her trusted position as a doctor to get people to let her write them compounded cream prescriptions. Not only that, but she wrote the prescriptions for one woman whom she had never seen or spoken with. *See supra* at 19–20. That instance goes beyond the district court's definition of compulsion, and way beyond solicitation. Solicitation of prospective patients cannot serve as a basis for justifying a harsher sentence for Stone than for Bramwell.

The district court was moved by what Bramwell's supporters said on her behalf at the sentence hearing and by the large number of letters it received from her family members, friends, neighbors, former colleagues, and others, all attesting to Bramwell's reputation, virtues, community service, and history of good works. The content of those statements is impressive. Relying on them, the court contrasted her with Stone, who it said had "no history of good works . . . just simply none." The court was mistaken.

To be sure, the number of people who came forward for Stone did not approach the number who came forward for Bramwell. But two people did make statements in support of Stone at his sentence hearing, and the court received letters from one of those people and from four other people attesting to his good character, kindness, and work ethic.

One of those letters was from Stone's fiancée, a nurse, who told the court about the extraordinary way Stone had helped her through the process of adopting a baby. She described how he "was very supportive every step of the way" and "was there holding [her] together when things got rough, and overwhelming." After the baby boy was born, Stone made a two-and-a-half-hour trip to visit him every day of the week he was in the neonatal intensive care unit. Because the adoptive mother was a nurse working three twelve-hour shifts every weekend and had no family in the area, Stone stepped up to take care of her baby so that she could work to support her child and herself.

As she put it, "[t]his man was living in a hotel room in a wheelchair caring for a newborn baby, so his mama can work to provide for her child." To her, that was "very honorable of him[,] something he did not have to do, but he did." And she added, "so many men today don't even take care of their naturally born children, and here is a man who sacrificed for a child who was not even his." The district court did not find that the woman wasn't credible, and it would have been hard pressed to do so. Her statements were corroborated at the sentence hearing by a friend of Stone's who had witnessed how he had looked after the child so the mother could work. The same friend described how Stone had also served as his caregiver. Apparently, the court simply overlooked the good works and kindness of Stone that were recounted in the woman's letter and the man's statements at Stone's

sentence hearing. The court's belief that Stone had no history of good works, "simply none," was mistaken.

Regardless, the court abused its discretion in imposing a sentence on Bramwell that was so far out of line with the sentence it had imposed on Stone. The "history and characteristics of the defendant" is an important factor in sentencing. *See* 18 U.S.C. § 3553(a)(1). But it should not be the single-minded focus to the detriment of all other factors. *See Crisp*, 454 F.3d at 1292 ("The district court focused single-mindedly on the goal of restitution to the detriment of all of the other sentencing factors. An unreasonable approach produced an unreasonable sentence."). That is what happened here and what caused the district court to impose a sentence on Bramwell that was so out of line with the one it imposed on Stone. *Cf. Irey*, 612 F.3d at 1221 ("The disparity arises not because the defendants in the cited cases were denied a downward variance they should have received and were sentenced too harshly, but because [the defendant in this case] was given a downward variance he should not have received and was sentenced too leniently.").

Not only is Bramwell's sentence of probation substantially out of line with the sentence imposed on Stone, our precedent establishes that it would be substantively unreasonable even if it were not unduly out of line with Stone's. *See United States v. Hall*, 965 F.3d 1281, 1299 n.5 (11th Cir. 2020) (comparing the defendant's sentence to the sentences of defendants in other cases who had similar records and were found guilty of similar con-

duct) (citing 18 U.S.C. § 3553(a)(6)); *Duperval*, 777 F.3d at 1337–38 (considering the defendant's argument that "his sentence is unreasonable because defendants in similar cases received lower sentences"). We've already discussed how our precedent emphasizes the need for general deterrence in financial crime cases and how our decisions have vacated sentences of probation, or probation with some period of home detention, for white collar criminals. *See supra* at 56–59.

Some of that precedent involves sentences in financial crime cases that we vacated as unreasonably lenient even though the defendants had so readily and thoroughly cooperated with the government that they received downward departures under U.S.S.G. § 5K1.1 for substantial assistance. *See Hayes*, 762 F.3d at 1307–08, 1310–11 (vacating a probation sentence that included home confinement); *Martin*, 455 F.3d at 1237–42 (vacating a sentence of seven days in custody after previously vacating a sentence of probation that included home confinement); *Crisp*, 454 F.3d at 1287–89 (vacating a sentence of five hours imprisonment and five years supervised release with 12 months of it in home confinement); *see also United States v. Livesay*, 587 F.3d 1274, 1277–79 (11th Cir. 2009) (vacating, for the third time, a probation sentence); *cf. Kuhlman*, 711 F.3d at 1325–26, 1330 (vacating a probation sentence as substantively unreasonable when the defendant had not received a § 5K1.1 departure but had paid full restitution and had logged 391 hours of community service before his sentence hearing).

Those decisions show that the probationary sentence imposed on Bramwell, who did not render any assistance, is unreasonably lenient and out of line with other sentences imposed in similar cases. Unlike the defendants in the *Hayes*, *Martin*, *Crisp*, and *Livesay* cases, Bramwell did not qualify for a § 5K1.1 substantial assistance reduction. Far from it. She did not even qualify for an acceptance of responsibility reduction.

And after she was convicted and was facing the judge at sentencing, Bramwell still couldn't quite face up to the fact that she had committed a crime. She stated that she "still d[id]n't know some of what happened." She acknowledged that she "need[ed] to take responsibility for what [she] need[ed] to learn from this," and apologized "for what has happened and for the burden that this has caused," but she insisted that she had "never done anything except for help people," which "is what [she] was born to do." As the prosecutor summed up Bramwell's attitude: She's "not a person who has accepted responsibility to her community, to her family and to her loved ones; [she's] a person who still thinks she hasn't done anything wrong."

Because she refused to accept responsibility or cooperate, Bramwell's sentence of probation is even more unreasonable than the probation sentences we vacated in the *Hayes*, *Crisp*, and *Livesay* white collar crime cases. In each of those three cases the defendants did accept responsibility and rendered substantial assistance to the government. *Cf. United States v. Docampo*, 573 F.3d 1091, 1101 (11th Cir. 2009) ("[D]efendants who cooperate with the

government and enter a written plea agreement are not similarly situated to a defendant who provides no assistance to the government and proceeds to trial."); *Duperval*, 777 F.3d at 1338 (holding that a defendant was not similarly situated to, and thus could receive a much higher sentence than, a co-defendant who had "cooperated with the government and pleaded guilty").

### 5. The Clear Error of Judgment When Weighing Bramwell's Pre-Crime History and Characteristics Against Her Serious and Prolonged Criminal Conduct

The Sentencing Act provides that courts can and should consider "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). But that history cannot be considered in isolation and without regard to the criminal conduct for which the defendant has been convicted and the characteristics it reveals. All of the circumstances and applicable factors must be considered and given weight. A sentencing court may give one factor substantially more weight than others. *Rosales-Bruno*, 789 F.3d at 1254. But only if it is reasonable to do so and only to the extent that it is justified. *See Crisp*, 454 F.3d at 1292 (noting that "a district court's unjustified reliance upon any one § 3553(a) factor is a symptom of an unreasonable sentence") (cleaned up).

The letters and oral statements of her supporters that Bramwell presented are strong and relevant evidence of her pre-criminal personal history and of her personal characteristics. The court was correct to consider them. But in light of the totality of the circumstances, that factor cannot reasonably be held to out-

weigh all of the other § 3553 factors in this case. *See Pugh*, 515 F.3d at 1194 (holding a "non-custodial sentence" unreasonable and noting that the district court "minimized—and in some instances, ignored—many . . . important Section 3553(a) concerns"). "[S]ignificant reliance on a single factor does not *necessarily* render a sentence unreasonable," *Kuhlman*, 711 F.3d at 1327 (emphasis added), but a court's "unjustified reliance upon any one § 3553(a) factor is a symptom of an unreasonable sentence," *Crisp*, 454 F.3d at 1292 (cleaned up).

In the *Hayes* case, the district court varied from an adjusted guidelines range of 41 to 51 months to a sentence of probation for a 67-year-old, white collar defendant with no prior criminal history who "was genuinely remorseful, was not likely to commit further crimes, and was not a risk to the public." *See* 762 F.3d at 1302, 1305, 1308. But we held that the 41-month downward variance to probation was substantively unreasonable and noted those specified factors "are usually present in most white-collar cases resulting in a guilty plea." *Id.* at 1308, 1310–11. And that is, if anything, even more true in health care fraud cases. *See* U.S. Sent'g Comm'n, *The Criminal History of Federal Offenders* 4–6 (2018); U.S. Sent'g Comm'n, *Quick Facts, Health Care Fraud Offenses* (2018) ("The majority of health care fraud offenders had little or no prior criminal history (86.8% of these offenders were assigned to Criminal History Category I)."). Our holding in *Hayes* is at least as apt here because Bramwell, unlike the defendant in *Hayes*, did not accept responsibility and plead guilty, did not provide sub-

stantial assistance to the government, was not elderly, and was not in deteriorating physical health. 762 F.3d at 1302–05.

In this case, the district court gave far more weight to the § 3553(a)(1) history and characteristics factor than to any other factor — more weight than it gave to all of the other factors combined. Its sentencing decision was based primarily on the good deeds Bramwell had performed and the characteristics she had demonstrated before she became what the court itself found to be "the driving force" in a significant criminal enterprise that operated with her energetic participation for more than a year, that resulted in a multi-million dollar loss, and that ended only when the source of revenue funding the illegal payments was cut off.

To say the district court was moved by the supporting words of Bramwell's many friends, relatives, and co-workers is an understatement. The court was so moved by them that it allowed those reports about Bramwell's non-criminal history and deeds to outweigh six factors that strongly favored a greater than mere probation sentence. To recap, those six factors are: the nature and circumstances of the offense, 18 U.S.C. § 3553(a)(1); the seriousness of it, *id.* § 3553(a)(2)(A); the need to promote respect for the law, *id.*; the need to provide for just punishment, *id.*; the need to afford adequate deterrence, *id.* § 3553(a)(2)(B); and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," *id.* § 3553(a)(6).

The court decided that the combined weight of those six factors were outweighed by the single factor of Bramwell's pre-crime life and characteristics as described in the letters and statements supporting her.  And it decided that the combined heft of those six factors was outweighed by enough of a margin to justify not only a downward variance but an extraordinary downward variance — from an imprisonment range of 78 to 97 months to a sentence of zero months, zero weeks, and zero days in custody.

Before varying down from six-and-a-half years to probation, the court stated that it was "fully . . . aware of the fact that [§] 3553 factors would support a period of incarceration." And it told Bramwell that the prosecutor had made "a very compelling argument that any number of ways that [it] look[ed] at the calculation of sentencing to compare [her] to Mr. Howard or to compare [her] with Mr. Stone indicates in favor of an incarceration sentence."

In discussing the letters and statements that supported Bramwell and swayed it, the court said this:

> I sincerely hope when the sentence I'm about to pronounce is reviewed by the Court of Appeals that they take the time to [r]ead the letters, that they take the time to listen to the [unsworn supporting statements] I heard, because there is a level of inherent goodness that's portrayed about you that I can't just ignore. It's something that is real. *You can tell it from the people who write about you who know what you did. I disagree that your community*

*doesn't know.* I don't imagine that they know everything, but they — *people writing to me knew that you had been convicted, they didn't debate the merits of that conviction, and they still had to say about you what they said about you.*

Doc. 280 at 84–85 (emphasis added).

It is apparent from the part of the quoted remarks we have emphasized that the letters supporting Bramwell made a greater impression on the court because it thought the letter writers did not quarrel with the fact that Bramwell was, as the jury found, guilty of committing serious crimes. *See id.* (explaining its view that the letter writers "know what [she] did" and "didn't debate the merits of [her] conviction"). The court's thought being, we suppose, that it's easier to vouch for someone as honest and morally upright after she's been convicted of a serious crime involving moral turpitude if you believe she is innocent of that crime and was wrongly convicted. But if you accept that she's guilty of a serious crime and you are still convinced she is a good person, that is really something.

As the district court hoped, we did read all of the letters, as well as the transcript of the oral statements made on Bramwell's behalf at the sentence hearing. Which is why we know that the district court was mistaken. At least a dozen of the letter writers insisted Bramwell was not guilty, some of them fervently. Each of these quotations is taken from a different letter:

- "Finally, while I am unaware of the specific charges against Dr. Bramwell, I remain convinced that she did nothing wrong . . . and that allegations to the contrary are false." Doc. 207 at 21 (Catherine Lamprecht).

- "To believe anything dishonest, cruel, prideful[] or greedy about Nicole Bramwell is to not know her at all." *Id.* at 28 (Jeanne Cates).

- "I'd stake my reputation on the fact that Dr. Nicole didn't and wouldn't conspire to defraud anyone knowingly. She's just not that kind of person. Hard working, yes! Loyal, Yes! Faithful, Yes! Integrity, Yes, Yes! A Great Doctor, Yes! Honest, Yes! Giving, Yes! A conspirator, No Way! A Crook, No Way! A Thief, No way!" *Id.* at 36 (Pastor Kevin Craig).

- "I am deeply hurt by the charges against Dr. Bramwell and believe she has been falsely accused." *Id.* at 41 (Kyria Dukes).

- "As an experienced clinical scientist, I listened hard [at the trial] for information that would prove my assessment of her to be wrong. I did not hear it. I am not a fool who would continue to support a physician whom I believe to be dishonoring my profession." *Id.* at 51 (Janice Howell).

- "Ethically, her standards are second to none. It is such a tragedy that she has been associated with such a heinous event. I am positive without any doubt that she would not knowingly participate in any questionable activities that

would compromise her career, her family, herself, or her ethics." *Id.* at 62 (Adria Jackson).

- "I believe in her innocence . . . ." *Id.* at 72 (Kimberly May).

- "I know that Dr. Bramwell is innocent of these charges." *Id.* at 79 (Wanda Muhammad).

- "Knowing her personality, I know she would not intentionally break the law." *Id.* at 90 (Carolyn Ramsey).

- "I was startled to hear of her present legal difficulties and very much doubt that Dr. Bramwell purposely violated any laws." *Id.* at 91 (Douglas Short).

- "At no time, would Nicky knowingly accept money, or other rewards, that she didn't earn honestly! . . . There has been absolutely no sign that she has been receiving anything, as a kickback. Nicky has worked hard to earn money from legal jobs, and would not jeopardize her reputation; her as well as her family's future and well-being; or go against her values; for money from kickbacks!" *Id.* at 97–98 (Maxine Thames-Parchment).

- "I am deeply saddened and hurt by the outcome of the initial verdict, and perplexed by how or why she's even having to go through this at all. . . . Your Honor, if there is anything legally within your power that you can do to right this wrong against my sister, I thank you . . . ." *Id.* at 106–07 (Danielle Jeanine Bramwell).

Unfortunately, the letter-writing supporters listed and quoted above, and other people who were convinced that Bramwell was incapable of dishonesty and was innocent of the crimes that she was convicted of committing, were mistaken. The evidence, much of which was undisputed, overwhelmingly proved that Bramwell was guilty of being an essential part of a multimillion dollar criminal enterprise that operated for more than a year, and might still be operating if not for a change in government policy. *See supra* at Part II.D.1. The jury found beyond a reasonable doubt that Bramwell was guilty and the district court agreed.

The supporting letters and unsworn statements at the sentence hearing had a powerful effect on the court. Their impact was enough to overcome the court's being, as it said, "fully . . . aware of the fact that [§] 3553 factors would support a period of incarceration" and its being aware that "[t]his is a serious crime." And their impact was enough to persuade the court not to act on what it called the "very compelling argument" that Bramwell should receive "an incarceration sentence." Despite all of the compelling reasons it should have sentenced Bramwell to some imprisonment, her supporters convinced the court that Bramwell should not serve a single day in jail.

Addressing Bramwell, the court stated that what her supporters had written and said about her was the reason she was not going to serve any time. The court told her it was convinced "there is a level of inherent goodness that's portrayed about [her]

that [it] can't just ignore. It's something that is real." The court complimented Bramwell, saying she had "lived an exemplary life throughout [her] entire life" and had been "a truly remarkable person." At the same time, the court noted that Bramwell's crimes were "not a one-time instance," but in fact continued over "a lengthy period of time." And it acknowledged that her criminal conduct was serious but concluded "it is, nonetheless, aberrant behavior from the way [she had] lived [her] life, and that simply has to be considered."

To be sure, the way someone has lived her life before she decided to become the driving force in a significant, long-running, multi-million dollar criminal enterprise should be considered. Section 3553(a)(1) says the history and characteristics of the defendant must be considered. The district court was correct to consider that factor, and it can justify some of the difference between Stone's and Bramwell's sentences, but not the difference between two years and probation. It was not reasonable to give Bramwell's history and characteristics so much emphasis that the factor outweighed all of the factors strongly indicating that some imprisonment was needed to serve the goals of sentencing.

It was unreasonable for the court to let that factor overcome what it told Bramwell was "a very compelling argument that any number of ways that [it] look[ed] at the calculation of sentencing to compare [her] to Mr. Howard or to compare [her] with Mr. Stone indicates in favor of an incarceration sentence." It was unreasonable to give that factor so much weight that it re-

sulted in a 100 percent downward variance of 78 months. *See Gall*, 552 U.S. at 50 ("[A] major [variance] should be supported by a more significant justification than a minor one."); *Irey*, 612 F.3d at 1196 ("Although there is no proportionality principle in sentencing, a major variance does require a more significant justification than a minor one. . . .").

> After announcing the sentence, the court stated:

> It is a variance and the variance is for the reasons I've identified, which is the lack of your criminal history, the fact that you have collateral consequences that are significant — you will likely lose your license, you'll be a convicted felon going forward — and the fact that this seems to be aberrant.

Doc. 280 at 90.

Bramwell's lack of criminal history had already been factored into her criminal history score, which resulted in a lower guidelines range than if she had a criminal history. *See Martin*, 455 F.3d at 1239 ("While the district court emphasized [the defendant]'s lack of a criminal record and viewed his fraudulent conduct as an 'aberration' in his otherwise outstanding life, [the defendant]'s criminal history category of I already takes into account his lack of a criminal record."). And, as we've already discussed, the two collateral consequences of Bramwell losing her medical license and becoming a convicted felon are not proper bases for a downward variance. *See supra* at Part IV.B.3.

That brings us to the court's reliance on its view of Bramwell's criminal behavior as "aberrant." Use of that term is accurate if we close our eyes to the scope and length of her eager and energetic participation in the multi-million-dollar criminal enterprise that began in April 2014. From that date forward she was the driving force in a $3.5 million kickback scheme spread out over more than a year, during which she wrote 394 prescriptions in return for 34 different kickback checks disguised to cover up the crimes. As the prosecutor pointed out, "for approximately 14 months . . . , more than once a day on average, she was making the absolute decision to engage in this scheme. That's not aberrational conduct. That's not an isolated incident. That is repetitive, repetitive conduct."

At the beginning of her criminal career, Bramwell's conduct was enough of a change in her previous law-abiding behavior that the first few compounded cream prescriptions she wrote and the first few kickback checks she accepted could be called aberrant conduct. But somewhere during the fourteen-month duration of her repetitive criminal conduct, while she was taking nearly three dozen kickback checks for writing compounded cream prescriptions over and over until she had written 394, her criminal conduct ceased being aberrant and became normal for her, part of her way of life, a regular source of income.

And it is not as if Bramwell stopped participating in the kickback scheme because of a change of heart, or because she had a moral epiphany and suddenly realized the wrongness of her

ways, or because the "inherent goodness" that the district court saw in her had finally taken charge. Instead, Bramwell stopped committing kickback crimes only when a major policy change by Tricare cut off the revenue source that had fueled the criminal conspiracy. Once that happened, the criminal enterprise Bramwell had been the driving force in could no longer be driven. There is no reason to doubt that but for the change in the Tricare payment policy, she would still be driving it along, writing compounded cream prescriptions and accepting kickbacks, with her inherent goodness in the backseat.

### 6. Summary

It is our duty to vacate a sentence as substantively unreasonable if we "are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." *Irey*, 612 F.3d at 1190 (quoting *Pugh*, 515 F.3d at 1191). A sentencing court commits a clear error of judgment, even if it considers all of the proper factors, when it "weighs those factors unreasonably, arriving at a sentence that does not 'achieve the purposes of sentencing as stated in § 3553(a).'" *Id.* at 1189 (quoting *Pugh*, 515 F.3d at 1191). The error is even more apparent when the court not only does not consider all of the proper § 3553 factors, but also considers some factors that are inapplicable in the case before it. That is what happened here.

In varying downward from the bottom of the guidelines range by six-and-a-half years, or 100 percent, to arrive at a sentence of probation, the district court diminished the seriousness of the offense, did not promote respect for the law, and did not provide just punishment for the offense. *See supra* at Part IV.B.1. It gave no weight at all to the need to impose a sentence that will deter other doctors from committing criminal conduct of this kind. *See supra* at Part IV.B.2. And it improperly relied on Bramwell's loss of her medical license, her convicted felon status, and the fact that she was tempted and had an opportunity to commit the crime. Because of her position of trust as a medical doctor, she had many opportunities to violate the law and she did so, over and over again. There is no evidence at all that she ever declined to write a prescription that would help get her a kickback. *See supra* at Part IV.B.3.

The district court also unreasonably allowed Bramwell's exemplary pre-criminal life and her good qualities, as attested to by her relatives, friends, and acquaintances, to outweigh the combined force of all of the factors warranting a sentence of imprisonment. *See supra* at Part IV.B.5; *see also Irey*, 612 F.3d at 1193 ("At the substantive stage of reasonableness review, an appellate court may consider whether a factor relied on by a sentencing court can bear the weight assigned to it.") (citation and quotation marks omitted); *Pugh*, 515 F.3d at 1194 ("[A] sentence may be unreasonable if it is grounded solely on one factor, relies on impermissible factors, or ignores relevant factors. At the end of the day,

the sentence in this case is unreasonable, and the district court's analysis suffers from many of these 'symptoms.'") (citation omitted). Bramwell's pre-criminal history and characteristics is a factor that can bear considerable weight, but not all of the weight the court put on it.

Finally, by sentencing Bramwell to no time in custody, the court created an unwarranted disparity between her sentence and the 24 months of imprisonment that the court imposed on her co-conspirator Stone. He was involved in the criminal enterprise for much less time than Bramwell, played a far less important role than she did, and profited only a fraction as much. *See supra* at Part IV.B.4; *see also Shah*, 981 F.3d at 923–24 (affirming the conviction of a doctor who wrote 209 compounded cream prescriptions during one six-month period of a yearlong conspiracy; who received a total of $55,350.43 in kickbacks, which cost Tricare "more than a million dollars"; and who was sentenced to 36 months imprisonment).

For all of these reasons, we "are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." *Irey*, 612 F.3d at 1190 (quoting *Pugh*, 515 F.3d at 1191). The court's explanation for its major variance from the guidelines range is not sufficiently compelling to support the degree of the variance. *See id.* at 1196 ("Although there is no proportionality principle in sentencing, a major variance does require

a more significant justification than a minor one . . . .").  While we review only for an abuse of discretion, our "review of the totality of the circumstances in this case through the lens of abuse of discretion yields the conclusion that [Bramwell's probation] sentence is substantively unreasonable." *Pugh*, 515 F.3d at 1192.

We vacate and remand the part of the judgment involving Bramwell's sentence to the district court for further proceedings consistent with this opinion.  As we said in our *Livesay* decision, "[n]ot only do we hold that the particular sentence imposed below is unreasonable, but we also hold that *any* sentence of probation would be unreasonable given the magnitude and seriousness of [Bramwell]'s criminal conduct."  587 F.3d at 1279.

We are not holding that any downward variance would be unreasonable.  Nor are we specifying a particular custodial sentence that would be reasonable.  What we are holding is that given the totality of the facts and circumstances in this case, probation is not a reasonable sentence.  A reasonable sentence in this case should include, at the least, a non-token period of incarceration.  *See Hayes*, 762 F.3d at 1311; *Livesay*, 587 F.3d at 1279; *see also Martin*, 455 F.3d at 1237–42.

## V.  CONCLUSION

The judgments are AFFIRMED, except that the sentence component of the judgment in Bramwell's case is VACATED and REMANDED for further proceedings consistent with this opinion.

**AFFIRMED in part, VACATED and REMANDED in part.**